**NEW OAKMONT CORPORATION v.
UNITED STATES.**

No. 46275.

United States Court of Claims.

Nov. 7, 1949.

Paul R. Russell, Washington, D. C., for the plaintiff. Shearman & Sterling & Wright, New York City, were on the briefs.

H. S. Fessenden, Washington, D. C., with whom was Assistant Attorney General Theron Lamar Caudle, for the defendant.

Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

In its Personal Holding Company tax return for the year 1937 the plaintiff, in computing its adjusted net income, deducted $52,324.38 as additional income tax paid by it in 1937 for the year 1933. It was admittedly entitled to make this deduction, unless the $52,324.38 was a payment of the kind of taxes imposed by Section 104 of the Revenue Act of 1932, 26 U.S.C.A.Int. Rev.Acts, page 508, such taxes being in the nature of a penalty imposed on a corporation for permitting itself to be used to accumulate gains for its stockholders which, not being distributed to the stockholders, could not be taxed as their income.

The Commissioner of Internal Revenue determined that the $52,324.38 was paid as a Section 104 tax, and therefore disallowed its deduction by the plaintiff in determining its 1937 adjusted net income. He therefore assessed a deficiency of $20,342.30 of the plaintiff's Personal Holding Company surtax, together with interest of $3,114.84, both of which sums the plaintiff paid. The plaintiff filed timely claims for refund of these payments, which claims were disallowed.

The reason for the uncertainty as to whether the $52,324.38 payment was the payment of a Section 104 tax, is that the payment was made as a compromise settlement, after negotiation between the plaintiff and the Government concerning three separate tax liabilities for the year 1933 asserted by the Government and denied by the plaintiff.

The plaintiff had made its tax return for the year 1933, but a revenue agent, after an examination, had proposed a large net increase of the plaintiff's taxable income which would have increased its ordinary corporation income tax by $235,063.64, and had proposed the imposition of a Section 104 tax in the amount of $1,156,992.17. After negotiation and personal conferences between the representatives of the plaintiff and of the Bureau of Internal Revenue, all the plaintiff's asserted tax liabilities for 1933 were settled by the payment by the plaintiff of the $52,324.38 here in question.

The increase in the plaintiff's 1933 income proposed by the revenue agent was based upon two grounds. The first was that gold coins held abroad, and hence not surrendered to the Government in 1933, as gold coins held in this country had to be, had been used to purchase bonds of a foreign company. The second was that asserted losses on the sale of securities to associated companies and stockholders of the plaintiff should not be deductible from the plaintiff's income. The proposed imposition of a Section 104 tax was based upon the asserted fact that the company had been used as a means of accumulating income for its stockholders and withholding it from distribution so that they could not be taxed on it.

The plaintiff urges that it was not worried about the Section 104 tax, since it had, in fact, distributed 55% of its current income and had large unrealized losses on securities which it had purchased in 1928 and 1929, which losses it then thought, perhaps erroneously, would be a justification for not distributing its current income. It says that it was worried about the proposed increase in its income, and income tax, due to its purchase of bonds with gold coins held abroad.

The testimony of the agent for the Government who negotiated the settlement is that in effect he conceded or gave up the claim to the increased income tax. We can understand how the attempt to predicate profit upon a purchase of bonds or anything else for money might have seemed to be quite hopeless, from the tax-gatherer's

standpoint, though from the taxpayer's standpoint the fact that the money was gold coins held abroad, which no doubt increased largely in paper dollar value with the 1933 increase in the dollar price of gold, would present ominous possibilities for taxation.

The negotiations seem to have taken the turn that the negotiators, in typical trader fashion, allowed the conversation to pass to a matter not directly relevant. They made a rough computation of what the plaintiff's Personal Holding Company surtax would have been, under Section 351 of the Revenue Act of 1934, 26 U.S.C.A.Int. Rev.Acts, page 757, if that Act had been the law in 1933. To make this computation, the plaintiff's income as shown on its return for 1933, and without the additions which the revenue agent had proposed to make, was taken. This fact was a substantial indication that this agent of the Government did not have much faith in the revenue agent's proposed increase in income. But even as to the Section 104 tax, the Government agent obviously had little faith in its collectibility, or he would not have recommended that the tax which, even on the basis of the plaintiff's own return of income, would have amounted to some $303,000, should be settled for $52,324.38. The plaintiff's representative, though aware that, for the time being, his adversary was not hopeful of getting anything on the proposed increase of income, was still primarily anxious to get released from the unpleasant possibility that the gold coin transaction would be found to be taxable. If it had been, there would have been an unquestionable liability for $235,063.64.

The $52,324.38 was paid and the plaintiff was released from all tax liabilities for 1933. The Government says that the $52,-324.38 was in payment of Section 104 tax. We think it was not. The Government's agent may have thought that the Section 104 claim, though it was so weak that he was willing to discount it by some 80%, was the only one which had any merit at all. If he was willing to discount it by 80% it is easily believable that the plaintiff's agent thought it wasn't any good at all, and was, as we have found, paying his money primarily for the release from the other peril. We think we would not be justified in attributing all the payment to the Section 104 tax. And if not all, what part? There is no rational way to apportion it.

Because of the Government's treatment of the $52,324.38 as Section 104 tax under the Revenue Act of 1932, it refused to allow the deduction of this sum in determining the plaintiff's "adjusted net income" for 1937, and this increased that adjusted net income to an amount in excess of what the plaintiff had distributed in dividends, the excess even then being only $27,389.73. But the Personal Holding Company surtax on this undistributed net income was at the rate of 65% on the first $2,000 and 75% on the amount above $2,000. Hence the tax amounted to the $20,342.30 which is here sued for, with interest. It will be noticed, from the above figures, that if we were to attempt to apportion the payment made in settlement between the Section 104 tax and the ordinary income tax, we would have to apportion more than $24,934.65 of it to the former before any of the tax here in question would be payable.

 The surtaxes, at the rates named above, were penalty taxes for the purpose of compelling distribution of income. The rates, in comparison with other rates at that time, were severe. A taxpayer should not be subjected to a penalty unless he comes fairly clearly within the situation which is defined in the law as deserving to be penalized. On the facts before us, we are by no means clear that this is true. The Government wrote the release, and if it desired to attribute all or some specific portion of the money paid in settlement to the Section 104 claim, it could have so written and, if the plaintiff had agreed to such a release, that would have settled the question. We think it has no right, unilaterally, to so attribute the payment.

### Count Two

 On December 23, 1929, the plaintiff's predecessor, the Oakmont Corporation, purchased 40% of its common stock from five of its stockholders. The amount of the purchase price was determined by an audit

of the company's assets, and the stockholders were paid $8,377,712.45. The further sum of $850,000 was not paid, but was retained as an "allowance" to cover the known and unknown or undetermined liabilities arising on or before December 31, 1929. Thereafter the Oakmont Corporation paid out considerable sums for 1929 income taxes and interest and paid over the balance of the $850,000 to the former stockholders in 1932. A wholly owned subsidiary of the Oakmont Corporation, the West States Corporation, had, in 1932, filed a claim for refund of 1929 taxes, and, in 1939 a refund of $156,192.89, plus $70,903.01 of interest thereon, was made to the plaintiff, which had succeeded to the assets of the West States Corporation. In the prosecution of this claim for refund, the former stockholders of the Oakmont Corporation, which had been merged into the plaintiff corporation on December 30, 1932, were regarded as having an interest in the claim and were consulted and kept advised of progress by the persons who were handling the claim for the plaintiff. When the plaintiff received the refund it paid over 40% of the principal and 40% of the interest, less 40% of the legal fees and other expenses which had been incurred in obtaining the refund, to the former stockholders. Those stockholders returned the amounts which they received from the plaintiff on account of the interest, as interest income in their individual returns for 1939. The plaintiff did not return these amounts as interest income in its return, nor did it deduct, as an expense, the $13,404.58, which was the part of the fees and expenses which it had deducted from the payments to the former stockholders.

The Commissioner of Internal Revenue added to the plaintiff's returned income for 1939 the 40% of the interest received from the Government which the plaintiff had not included in its return. Income tax was assessed and paid upon this increase, and a timely claim for refund was filed and rejected.

As we analyze the transaction between the Oakmont Corporation and its five retiring stockholders, it was a sale by the stockholders and a purchase by the corporation of their stock for cash and promises. The stock was delivered and the cash paid. The promises were (1) that a further payment would be made of whatever amount might remain when the outstanding liabilities had been paid and their total deducted from $850,000; and (2) that if any money should come into the corporation as a result of assets or claims not included in the accounting upon which the sale price had been based, the corporation would pay them 40% of that money, less the proportionate part of the expense of collecting it. The transaction did not create a trust or agency fund of $850,000 in which the retiring stockholders had a property interest. If the corporation had become bankrupt, the former stockholders could not have claimed any part of this amount in preference to other creditors. It was a debt, contingent as to amount, and nothing more. The property interest of the former stockholders in the corporation, and in its assets, including the claim for refund of taxes, had passed by their sale of the stock.

When a prospect of getting a refund of taxes arose, the former stockholders were naturally interested. But their interest was not a property interest. It arose out of the corporation's promise to them that if it collected money for old assets not included in the accounting on which the purchase price was based, it would pay them 40% of what it collected. But again, if, having cashed the Government's refund check and put the money in the bank, the corporation had gone into bankruptcy, the former stockholders would have had no preferential claim over other creditors.

It follows from what we have said that the plaintiff, as the successor of the Oakmont Corporation, owned the claim for refund and the interest paid on that claim. Its payment pursuant to its agreement to the former stockholders of an amount equal to 40% of the interest it received did not affect the fact that it had received it as owner. Having so received it, the plaintiff was, prima facie, obligated to return it as income. We think, therefore, that the plaintiff's argument that this interest was not its income, but that of the former stockholders, is not valid.

The plaintiff urges, in the alternative, that the 40% of the interest paid by it to the former stockholders constituted a deductible business expense, and that the deduction would cancel out the income and, in effect, relieve it of any tax on that part of its income. We think that this contention is valid.

■ The plaintiff, pursuant to its lawful contract, paid this money to the former stockholders. Section 23(a) of the Internal Revenue Code, 26 U.S.C.A. § 23(a), permits the deduction from income of "ordinary and necessary expenses * * * in carrying on any trade or business." The payments were necessary, because they were made pursuant to a lawful contract. They were "ordinary," in the sense that the contract had no element of doubtful propriety in it. It was a simple agreement that if interest accrued on this asset, that interest would be shared with the former owners of the asset, after the expenses of obtaining it were paid. The fact that this taxpayer had not previously had occasion and would not again have occasion to make such a payment would not keep it from being an "ordinary" expense within the meaning of Section 23(a). See Appeal of First National Bank of St. Louis, 3 B.T.A. 807.

The Government argues that this payment by the plaintiff was a capital expenditure. It was, as we have shown above, made pursuant to a promise made in connection with the purchase of the stock of the former stockholders. But the element of the promise which required the plaintiff to pay over a share of any interest or income received in connection with the assets purchased did not make such a payment a payment for capital. It was only a collateral agreement that if income came in, it would be shared. Perhaps its real meaning was that if the plaintiff collected interest income on the asset, the refund claim, it would pay the former stockholders interest in an equivalent amount. If so, there could be no question of its deductibility. But whether we construe it so or not we think that the payment of this money, as to which the plaintiff was in effect, though not in legal form, merely a conduit in its passage from the Government to the former stockholders, constituted a deductible expense.

■ The Government has raised no question as to the sufficiency of the plaintiff's claim for refund to support a recovery on this alternative ground. We have, however, considered the question, and think the claim was sufficient. It was based upon an asserted right to exclude the portion of the interest from its income because it belonged to other persons, the former stockholders. We hold that the plaintiff had the right to deduct the amount from its income because its payment created a deductible expense. The plaintiff's statement of facts accompanying its claim for refund gave the tax authorities all the information necessary to answer the legal question as to taxability. The fact that the plaintiff's theory as to the title to the income was wrong should not, we think, make its claim for refund ineffective. See Addressograph-Multigraph Corporation v. United States, 78 F.Supp. 111, 112 Ct.Cl. 201.

■ A question not raised by the parties should be noticed. As shown in Finding 17, the refund made to the plaintiff in 1939 included $139,233.15 of taxes paid by the West States Corporation, $16,959.74 of interest paid by the West States Corporation for late payment of its taxes, and $70,903.01 of interest paid by the Government for the retention of the taxes and interest paid to it. The Commissioner of Internal Revenue, in assessing the plaintiff for 1939, included the $16,959.74 as interest income received by the plaintiff. It was not, of course. It was merely the repayment of interest which had been collected from the plaintiff's predecessor. The plaintiff seems to have made the same mistake in computing its accounts with its former stockholders. That made no difference in the amount paid to them by the plaintiff, but it probably misled them into returning as interest income sums which in fact were merely refunds of interest which the West States Corporation had paid.

The plaintiff is entitled to recover upon each count of its claim. The amount, com-

puted in accordance with this opinion, will be stipulated by the parties. Interest according to law will be included in the judgment.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.