**KENNECOTT COPPER CORPORATION**

v.

**The UNITED STATES.**

No. 493–59.

United States Court of Claims.

June 11, 1965.

Norris Darrell, New York City, for plaintiff, M. Bernard Aidinoff, Jerome K. Walsh, Jr., and Sullivan & Cromwell, New York City, of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant, Lyle M. Turner, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 45(a), now Rule 57(a), to Trial Commissioner W. Ney Evans, with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed on August 2, 1963. Plaintiff requested the court to adopt the commissioner's report in its entirety, the defendant requested the court to adopt the findings of fact with one exception and excepted to the recommended conclusion of law and opinion of the report. Briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the commissioner's opinion and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff in an amount to be determined pursuant to further proceedings under Rule 47(c).

## OPINION OF COMMISSIONER

### I

During the 7-year period of 1949–1955, plaintiff expended a total of $14,474,701.13 (hereinafter rounded off to $14.5 million) constructing substitute facilities for the United States Smelting Refining and Mining Company (hereinafter abbreviated as USSRMCO) to replace facilities destroyed by plaintiff in the course of stripping operations at its Utah Copper Mine in an area which, prior to the 1948 agreements between plaintiff and USSRMCO, had been exclusively owned by USSRMCO.

Plaintiff amortized the $14.5 million over the 9-year period of 1949–1957 against the tonnage estimated to be benefited, and claimed deductions for those

taxable years as ordinary and necessary expenses of mining. The deductions so claimed for the taxable years 1949, 1950, and 1951 were disallowed by the Commissioner of Internal Revenue. The resulting additional amounts of tax claimed to be due, and interest, were paid by plaintiff. Claims for refund, timely filed, were formally disallowed, and this action was instituted by plaintiff to recover its alleged overpayments of tax and interest, together with interest from the dates of payment.[1]

The parties agree that the sums so expended by plaintiff were reasonable in amount and were required in the discharge of plaintiff's obligations under the 1948 agreements.

The principal controversy in the case is whether the Commissioner of Internal Revenue was in error in disallowing the claimed deductions on the ground that "the expenditures made by plaintiff to acquire the various surface rights from USSRMCO [2] should have been capitalized and returned to plaintiff through annual depletion charges, rather than being deducted as an ordinary expense." [3]

II

Both the method (open pit mining) and the scope of operations at the Utah Copper Mine differ from the method and scope involved in most of the cases cited as precedents. The difference in method is a difference in kind. The difference in scope is one of degree.

The story had its beginning in geological time, when the convulsion of nature, which raised the Oquirrh Mountains in Utah, created in the process two types of mineral deposits: lode deposits (or veins), primarily of lead and zinc; and disseminated deposits, primarily of copper. Both types of deposits occur in the immediate area of the Utah Copper Mine, in what is known as the Bingham Mining District (named for Bingham Canyon). While the two types of deposits lie side by side, they are not appreciably intermingled.

Prospectors were in the area staking claims during the early years of the second half of the nineteenth century. By the end of the century hundreds of claims had been staked, and the process of consolidation of claims was well under way. All exploitation during this early period was by conventional methods of underground mining, through tunnels and shafts.

Some veins of copper were found and worked, but the extent of the veins usually proved to be limited. Continuing exploration revealed in outline a very large deposit of low grade copper ore disseminated among the porphyry. The copper content of this disseminated ore was below the tailings of copper then being mined in the Butte District. It would therefore not warrant mining by usual underground methods.

At the turn of the century two mining engineers devised a plan for exploiting this disseminated deposit of low grade copper ore by open pit mining. The surface area overlying most of the ore body was acquired by the Utah Copper Company,[4] and open pit mining was begun in 1906.

1. While only the taxable years 1949, 1950, and 1951 are immediately at issue in this case, the facts developed at the trial covered the full 9-year period; and the decision in this case will control the remaining taxable years.

2. As noted in the opening paragraph above, the $14.5 million expenditure was made to provide for USSRMCO substitute facilities for facilities destroyed by plaintiff in stripping operations pursuant to rights obtained by plaintiff from USSRMCO. These stripping rights were in an area known as Tract A. As further noted in the paragraph immediately above, plaintiff acquired *various* rights from USSRMCO. The stripping rights on Tract A represented only one of four or more categories of rights acquired. The $14.5 million expenditure reflected the whole of the consideration moving from plaintiff to USSRMCO in the transaction.

3. The language quoted is from the stipulation of the parties.

4. At the outset, ownership of the area overlying the ore body was divided between the Utah Copper Company and

Open pit mining is surface, or strip mining, with the stripping done in concentric circles. In order for the pit to go deeper, the surrounding circles have to be made larger. Banks are formed of steps or benches around the perimeter. All material cut from the pit or the benches is removed. At the Utah Copper Mine, material containing ore of cutoff grade or better is sent to the concentrating mills, while material in which the copper content is below cutoff grade is sent to waste dumps.

From the outset, the amount of material removed from the mine was substantial. For example, during the first 4½ years of open pit mining,[5] some 10.8 million cubic yards of material were removed, of which at least 6 million cubic yards were deposited on the waste dumps, while 4.8 million cubic yards were sent to the concentrating mills for the extraction of copper. During the next three decades the average annual volume of production was:

| Years | Millions of cubic yards removed | | |
|---|---|---|---|
| | Waste | Ore | Total |
| 1911–1920 | 4.58 | 3.80 | 8.38 |
| 1921–1930 | 5.75 | 5.44 | 11.19 |
| 1931–1940 | 7.00 | 5.70 | 12.70 |

As the open pit mine has grown, over the years, into the largest manmade excavation in the world, the volume of production has increased proportionately. During the 9-year period involved in this case (1949–1957), the average amount of material removed annually was 36.4 million cubic yards, consisting of 22.5 million cubic yards of waste and 13.9 million cubic yards of ore. At the time of trial (in October 1961) the mining goal called for the removal, daily, of 118,098 cubic yards of material, being 43,206 cubic yards of ore and 74,892 cubic yards of waste.[6]

The foregoing summary of the volume of production at the Utah Copper Mine indicates the demand of the operation for space. Within the surface area owned by plaintiff (or its predecessors), facilities had to be maintained at economic distances from the perimeter of operations, which meant that such facilities had to be moved outward from time to time. Since other mine owners held title to the land immediately adjacent to the ore body, the owners of the Utah Copper Mine had to acquire from these owners all necessary rights of ingress and egress and, as operations at the mine were expanded, additional rights for stripping had to be obtained as well as dumping rights for the disposition of wastes from

the Boston Consolidated Mining Company. These two companies were merged in 1910.

5. From August 1, 1906, through December 31, 1910.

6. For a visual concept of these volumes the writer has translated them into acre-feet. Since it is essential to avoid confusion between waste and ore, the figures used in this note relate only to waste.

The daily removal of 74,892 cubic yards of waste in 1961 represents the daily equivalent of 46 acre-feet: enough to provide a cover of 1 foot over 46 acres, or of 46 feet on 1 acre.

(In mountainous terrain space is available vertically as well as horizontally. It is therefore physically possible to cover 1 acre to a dept of 1,000 feet or more. The figures which follow are therefore intended as visual aids only.)

The annual average removal of 22.5 million cubic yards of waste, in 1949–1957, represents the equivalent of 13,946 acre-feet: enough to provide a cover of 21.79 feet over 1 section of land (640 acres). Nine years of such an average would provide a similar cover for 9 sections of land (5,760 acres).

From the inception of the mine to the end of 1960, waste removed from the mine totaled 580.9 million cubic yards, or 360,000 acre-feet: enough to cover 27 sections of land (17,280 acres) to a depth of 21 feet.

In terms of a potential highway, 100 feet wide, 360,000 acre-feet of material would provide a 21-foot fill over a distance of 1,414 miles.

the mine and from the concentrating mills.[7]

III

By 1947, open pit operations at the Utah Copper Mine were approaching the line dividing the properties of plaintiff and USSRMCO on the southern segment of the perimeter of the mine. If plaintiff had been unable to obtain additional stripping rights from USSRMCO, expansion of the concentric circles would have had to be halted in that segment. Such an interruption would have required plaintiff to move the center of the pit northward, in order to continue open pit mining without further disturbance of the southern segment.

Plaintiff had theretofore acquired rights from USSRMCO, for stripping and dumping and transport (railroad rights-of-way). Some stripping rights had been previously acquired over the very segment (Tract A) which now loomed as a barrier unless additional rights could be acquired. When plaintiff approached USSRMCO to acquire the needed, additional rights, USSRMCO asked plaintiff to anticipate as far as possible all the rights it would need in the future: dumping, leaching, and transport rights, as well as stripping rights. Plaintiff complied with this request.

The transaction between plaintiff and USSRMCO was consummated, after extended negotiations, on July 26, 1948, by the execution of a series of grants from USSRMCO to plaintiff and the exchange between them of various agreements.

The grants conveyed to plaintiff a number of perpetual easements, rights, and privileges over, on, and under various surface tracts, for use in stripping, dumping, and leaching. There was no conveyance of land, in fee simple. All rights to minerals in lode deposits were reserved by USSRMCO.

The agreements included (1) a boundary line agreement defining the separation of their respective properties, subsurface as well as surface; (2) a royalty agreement covering any disseminated copper or copper-molybdenum ores which might be recovered from Tract A; (3) extensions of options theretofore granted for the acquisition of transport (rights-of-way), dumping, and leaching rights; and (4) an agreement whereby plaintiff undertook to provide USSRMCO with substitute facilities to replace those facilities of USSRMCO which plaintiff would have to destroy in the course of stripping operations on Tract A.

Throughout the documents evidencing the series of grants and agreements, the consideration was expressed in nominal or formal terms (such as $1 and other good and valuable considerations, or in consideration of the premises, or of mutual undertakings) except for the agreement wherein plaintiff undertook to provide substitute facilities.

The $14.5 million spent by plaintiff to provide USSRMCO with substitute facilities represented the only consideration of substance moving from plaintiff to USSRMCO. Defendant challenges plaintiff's entire case at the threshold for lack of allocation of the expenditures to the various rights and benefits obtained. Plaintiff admits that no allocation was made, contending: that none was necessary (for reasons hereafter noted); that "No part of the substitute facilities expenditures was paid to acquire the other rights incidentally involved in the 1948

7. Minable ore was removed to concentrating mills, where the process of extracting the copper was begun. While the evidence contains little detail concerning waste from the mills as distinguished from waste from the mine, the inference is that mill wastes were also in huge volume, since the copper content of minable ore accounted for 1 percent or less of the total volume. From the inception of the mine to the end of 1960, 417 million cubic yards of ore were sent to the concentrating mills. If 75 percent of this volume emerged as waste, it would account for 193,853 acre-feet: enough to cover another 14 sections of land (8,960 acres) to a depth of 21 feet, or to provide a 21-foot fill over another 761 miles of a 100-foot-wide highway.

transaction"; and that "Since those expenditures constituted nothing more nor less than the price plaintiff had to pay to destroy USSRMCO'S former facilities in Tract A, they are properly allocable solely to the stripping rights acquired in Tract A, and to the related dumping rights needed for disposal of the Tract A waste material."

On the basis of this reasoning plaintiff would require as logical inferences either that USSRMCO made plaintiff a gift of the other rights or that such other rights were of no value. Neither inference is warranted.

The circumstances surrounding the transaction, as developed by the evidence, point to the conclusion (by inference) that both plaintiff and USSRMCO regarded the transaction as a whole as an entity in and of itself, of which the various grants and agreements were component parts; and that USSRMCO was content to enter into the transaction in return for plaintiff's undertaking to provide the substitute facilities.[8]

Within this context, the acquisition of stripping rights on Tract A and dumping rights on Tract B represented plaintiff's primary objective, and all other grants and agreements were incidental or subsidiary thereto.

The boundary line agreement was executed for the mutual benefit and convenience of the parties in clarification of their transaction as a whole.

Some of the rights for dumping and leaching were incidental to the exercise of the stripping rights on Tract A and the dumping rights on Tract B. Others were not directly related to rights in Tract A or Tract B. All were subsidiary to the main transaction.

Classification of the royalty agreement, whereby plaintiff agreed, in effect, to a division of profits with USSRMCO on disseminated copper or copper-molybdenum ores extracted from Tract A, requires some further analysis.

Plaintiff contends that the royalty agreement "stands on its own feet;" that "Any copper values which plaintiff may recover from Tract A under that agreement will be paid for under the terms of the agreement itself * * *."

Defendant would classify the royalty agreement as a purchase of minable ore. In fact, defendant has placed such emphasis, at the trial of the case and in its brief, upon the copper content of Tract A as to warrant examination of the situation at this point in the interest of perspective.

The evidence establishes the following pertinent facts: (1) plaintiff did not purchase a fee simple title to Tract A; (2) the rights acquired in Tract A were stripping rights; (3) the purpose of the acquisition was to obtain access to ore already owned by plaintiff; (4) Tract A was known to contain disseminated copper ore below cutoff grade; (5) plaintiff anticipated stripping all or virtually all of Tract A as waste; (6) plaintiff further anticipated placing the waste from Tract A on waste dumps which would be leached for the recovery of such ore as might be so obtained; (7) the parties to the transaction (plaintiff and USSRMCO) recognized the possibility that minerals of value might be uncovered in the course of stripping operations; (8) USSRMCO accordingly reserved to itself all minerals which might be found in lode deposits; (9) with respect to disseminated copper ore of minable quality, if any should be found, agreement was made for plaintiff to mine such ore in usual course and to account to USSRMCO for part (approximately half) of the profits therefrom.

When viewed in this context, the royalty agreement appears as essentially an adaptation, based on the practical aspects of mining operations, of USSRMCO'S reservation of mineral rights in Tract

8. Plaintiff and defendant have stipulated that under Utah law plaintiff had the power of eminent domain; and USSRMCO, in one of the documents, recognized that such power was a "claimed right" of plaintiff.

A. As such, the royalty agreement was as much an incident of the transaction as a whole as was USSRMCO'S outright reservation of lode deposit minerals.

IV

The legal issues in the case include the following:

1. Whether plaintiff's failure to make an allocation between deductible and non-deductible expenditures precludes recovery;

2. If recovery is not precluded by plaintiff's failure to allocate, whether the amortization made by plaintiff is legally acceptable;

3. Whether the expenditures should have been listed for depletion under section 23(m);

4. If recovery is not otherwise precluded, whether the expenditures are deductible—

a. Under the receding face doctrine; or

b. As ordinary and necessary expenses of mining—

(1) In normal course, under section 23(a) (1) (A); or

(2) As deferred expenses representing development costs of a producing mine; and

5. Whether plaintiff is precluded, by lack of notice in its claim for refund, from raising the issue of section 23(cc), and, if not so precluded, whether the expenditures for 1951 are deductible under that section, although there may be no recovery as to the years 1949 and 1950.

V

Before undertaking an analysis of the legal issues seriatim, it is appropriate to enter a caveat to the undertaking as a whole, because of the nature of the case.

As heretofore noted, both the method and the scope of operations at the Utah Copper Mine differ from the method and scope of the mining involved in most of the cases from which guidance must be drawn. Conventional underground mining is involved in most of the decided cases. There are fundamental differences between underground mining and open pit mining, which make comparison between the two methods difficult and therefore uncertain.[9] The scope of operations at the Utah Copper Mine is so vast as to require constant checks of dollar amounts against other, related costs or returns to insure the retention in judgment of relative values.[10]

Moreover, hardly any facet of the analysis of legal issues in this case is free from semantic difficulties.

The term "capital expenditures," for example, is nowhere defined with precision; yet it has been variously used by tax authorities to mean expenditures deductible only through depletion and depreciation allowances, expenditures deductible as deferred expenses over a longer period than 1 year, and expenditures which are not deductible at all.

The phrase "development costs" entered the language of tax law as descriptive of costs incurred in bringing a mine into production. Now, there is recognition of development costs incurred after the mine has reached the producing stage.

9. For example, the regulations which permit costs incurred to reach the receding face of a mine to be deducted as expense rather than as a capital outlay were written in terms of the mechanics of underground mining. Since the face of an open pit mine may recede as clearly as the face of a seam of underground coal, there is no reason in principle why an open pit mine should not have the benefit of the regulations. In practice, however, the methods of catching up to the receding faces of open pit and underground mines differ so radically that it is quite difficult to apply the terminology of the regulations to the open pit mine.

10. The very first fact of moment in this case is that plaintiff spent $14.5 million to provide substitute facilities for USSRMCO. Thus, the amount spent was sizable, and it was obviously used for extensive, durable, physical structures. As a consequence, the uninitiated is likely to enter the case with an impression almost as strong as a rebuttable presumption that the expenditure was a capital outlay.

Preparatory development costs have been fairly well defined. The development costs of a producing mine have not been so well defined.

The law authorizes deductions for depletion and deductions for depreciation, to permit the owner of a mine to recapture his investments in ore and in physical installations such as buildings and equipment. In both the statutes and the decided cases there are occasions when depletion allowances become depreciable and depreciation allowances are depletable.

As a final note on semantics, the cases which bear on the issues here presented involve many borderline conclusions in their appraisal of particular situations. Instances are not uncommon of over-simplification, of classification by fiat, or of a gloss of added emphasis to compensate for uncertainty. The result is that attempts to harmonize the decisions often prove futile.

Because of the difficulties inherent in the undertaking to analyze the legal issues, extended discussions of many cases bearing upon those issues have been omitted from this opinion.

VI

Defendant challenges plaintiff's entire case at the threshold on the ground that unless plaintiff can show that it is entitled to a deduction for each and every one of the rights acquired, its action fails completely.

It is true, as noted in defendant's brief, that where an allocation between deductible and nondeductible expenses is necessary, the taxpayer has the burden of establishing a basis upon which the court can make the necessary allocation.[11] Plaintiff admits that no attempt has been made to allocate portions of the expenditures among the various rights acquired, and contends that the entire expenditure is deductible without allocation.

The parties are thus agreed that deductibility applies to all of the expenditures or none. They disagree as to the approach to be used to determine which it shall be. Defendant would impose upon plaintiff the burden of proving the deductibility of each and every one of the rights. Plaintiff responds by saying the entire expenditure is deductible because the purpose for which it was made qualifies it as an expense of mining. The parties are thus comparing apples and oranges, and neither is quite precise in the comparison.

As noted in an earlier portion of this opinion, in listing and grouping the rights acquired by plaintiff, the writer does not agree with plaintiff's contention that no part of the substitute facilities expenditures was paid to acquire the rights incidentally involved in the 1948 transaction, or that the "expenditures constituted nothing more nor less than the price plaintiff had to pay to destroy USSRMCO'S * * * facilities * *," wherefore the whole of the expenditures "are properly allocable solely to the stripping rights * * * in Tract A, and to the related dumping rights * * *" in Tract B and elsewhere.

The evidence indicates that both plaintiff and USSRMCO regarded the 1948 transaction as an entity, and that plaintiff's expenditures to provide substitute facilities for USSRMCO constituted the consideration moving from plaintiff to USSRMCO for all of the rights and agreements embraced in the transaction.

As further noted in the same analysis, all of the rights other than the Tract A stripping rights were subsidiary to the Tract A rights, and all of the rights (including the Tract A rights) were related to the same primary purpose, which was, as plaintiff says, to enable the mine owner to continue normal production under existing plans and methods.

11. Citing Brinson v. Tomlinson, 264 F.2d 30 (5th Cir. 1959), cert. denied, 361 U.S. 830, 80 S.Ct. 79, 4 L.Ed.2d 72; Nowland v. Commissioner, 244 F.2d 450, 454 (4th Cir. 1957); Harden Mortgage Loan Co. v. Commissioner, 137 F.2d 282, 284 (10th Cir. 1943), cert. denied, 320 U.S. 791, 64 S.Ct. 206, 88 L.Ed. 476.

In short, my view of the situation is that plaintiff acquired one bundle of related rights, wherefore a separate allocation of costs would be a work of supererogation unless it should appear that some specific part of the bundle was of a nondeductible nature. This approach differs slightly from that of either of the parties.

The portion of defendant's brief in which the allocation challenge is stated is barren of specifics. It does not refer to any one right or group of rights as being nondeductible. Elsewhere in its brief, however, the point is made that allowance of plaintiff's substitute facilities expenditures as a deductible expense of mining would result in double deductions in relation to Tract A because of the copper content of the tract.

The occurrence of double deductions, one for expense, and one for depletion allowance, in relation to one and the same tract, rights to which were acquired in the 1948 transaction, would suggest that the bundle of rights contained some element of capital outlay, and this would be nondeductible wherefore plaintiff's failure to allocate would preclude recovery.

The facts warrant the conclusion that double deductions would result (if plaintiff is permitted to deduct the substitute facilities expenditures as an expense of mining) in two ways: because of depletion allowances for copper ore recovered through the leaching of Tract A waste; and because of depletion allowances for copper ore mined and to be mined from Tract A.

Plaintiff knew, when it negotiated with USSRMCO, that the earth in Tract A contained disseminated copper ore below cutoff grade. Plaintiff anticipated stripping all of Tract A as waste (subject only to the "possible" ore hereinafter mentioned). The waste was to be put on dumps, which plaintiff intended to leach, for the recovery of copper by that method. In time, there will be some recovery of ore by leaching. When that time comes, unless there is a change in the law meanwhile, plaintiff will be entitled to include the income from ore recovered by leaching with income from mined ore in claiming a percentage depletion. To this extent, if the substitute facilities expenditures are deductible as mining expenses, there will result a double deduction on account of Tract A.

Waste dumps must be allowed to stand for 10 years or more, to permit oxidation, before leaching is warranted. At the time of the trial of this action (in October 1961), no leaching had been done on Tract A waste.

Leaching is not a profitable enterprise, in and of itself. It is strictly a salvage operation of industrial waste. Returns realized from the process are credited by plaintiff against the cost of stripping, and are thus reflected in its books as results of efficient operation. In time the dollar value of ore recovered by leaching Tract A waste dumps may (and probably will) be substantial, although small indeed in relation to other dollar volumes of costs or returns.

The depletion allowance on ore to be recovered through the leaching of Tract A waste will be miniscule in proportion to plaintiff's overall operations. If the occurrence in the future of a depletion allowance of such miniscule proportion must be deemed to deny deductible status to plaintiff's substitute facilities expenditures, simply for lack of allocation, a very small tail will be wagging a very large dog. If the ore to be recovered through leaching comprised all of the ore subject to a depletion allowance in the future, I would have no hesitancy in dismissing the allocation problem as a minor incidental.

There is, however, more substance to the depletion allowance to be had upon ore mined or to be mined from Tract A, although substance in this instance does not appear to be controlling, for reasons hereinafter set forth.

As earlier noted, plaintiff and USSRMCO in their negotiations recognized the possibility that mineral ores of value might be uncovered by plaintiff's stripping of Tract A. USSRMCO reserved to itself all such minerals as might be found in lode deposits, and the parties

entered into a royalty agreement covering disseminated copper and copper-molybdenum ores of cutoff grade or better. Plaintiff was to mine the ore in usual course and account to USSRMCO for a share of the profits. Previous analysis has recorded the writer's judgment that this agreement was in essence an adaptation (based on practicality) of USSRMCO'S reservation of mineral rights and therefore consonant with classification as merely another incidental agreement within the whole transaction.

No fact in evidence is more clearly established than the attitude of the parties to the transaction toward the copper content of Tract A. They regarded it as "possible" ore, and dealt with it as such. They made no effort to ascertain its actual presence; they merely anticipated the possibility of its presence, and agreed upon an arrangement to take care of the contingency.

In 1957, after the close of the period over which plaintiff amortized its substitute facilities expenditures, one or more stringers of disseminated copper ore of cutoff grade or better were found in Tract A. The ore was mined by plaintiff, and accounting made to USSRMCO in conformity with the royalty agreement.

By the time of the trial of this case (October 1961), stripping operations on Tract A had progressed far enough to give the parties to the transaction (plaintiff and USSRMCO) clearer insight as to the presence and content of the stringers containing minable ore. The ultimate take was still conjectural, but it did appear that the quantity of minable ore from Tract A would exceed the amount of ore recoverable through leaching,[12] wherefore the dollar value of depletion allowances may eventually prove substantial.[13]

The fact is thus established that, in the course of stripping Tract A, and quite apart from the leaching of Tract A waste, plaintiff will obtain substantial copper ore, upon which it has received (or will receive, absent a change in the law) an allowance for percentage depletion. If, therefore, the substitute facilities expenditures are deductible as mining expenses, plaintiff's records will ultimately show double deductions on account of Tract A.

The outstanding facts are (1) that plaintiff did not seek or obtain the Tract A rights in order to acquire mineral deposits; (2) the actual presence of minable ore was ascertained years after the transaction was consummated; and (3) allocation of a portion of the substitute facilities expenditures to the copper content of Tract A would have been an impossibility (short of a guesstimate) at the time of the transaction.

Under the circumstances, the extent of minable ore taken or to be taken from Tract A is a misleading factor. It might have proved so small as to be negligible. It may prove more extensive than either plaintiff or USSRMCO would have thought possible at the time of the transaction.

The controlling factor, in my view, is the incidental relationship of the royalty agreement to the transaction as a whole. It was, in actual fact, incidental, and a rather minor incident at that. To sever it from the remainder of the transaction and regard it as an independent transaction results in a gross distortion of emphasis.

Plaintiff contends that "[t]he law is well settled that where an expenditure is made primarily for a purpose which renders the expenditure deductible as an expense, the entire amount is deductible

12. The evidence does not sustain defendant's contentions that the gross income from minable ore in Tract A will run into tens of millions of dollars, or that plaintiff will recover, from the copper content of Tract A (through leaching and mining combined), the cost of the substitute facilities.

13. While the evidence on the point is not clear, it is to be inferred that plaintiff will have the benefit of one-half of the depletion allowance on all of the copper ore taken from Tract A.

even though the expenditure incidentally resulted in the acquisition of benefits which would be non-deductible if obtained in an independent transaction."[14]

Whether "the law is well settled" or not, logic and equity favor plaintiff's position. It is not the spirit of the law that the presence, wholly as an incident, of a nondeductible benefit among a bundle of rights acquired for a purpose which makes the bundle as a whole deductible, should infect all of the parts like a spoiled apple in the bottom of the barrel. Instead, the presence of such a benefit in a bundle of rights is a relative thing, and should be evaluated as such. It is concluded, therefore, that if, in fact, plaintiff's purpose in making the substitute facilities expenditures was such as to render those expenditures deductible as mining expenses, the failure to allocate costs to the copper content of Tract A should not preclude recovery.

VII

A similar standard of relativity should apply to plaintiff's amortization of the substitute facilities expenditures. If plaintiff is otherwise entitled to recover, its recovery should not be precluded by the fact that, in the retrospect of litigation, other bases of amortization were available, as long as the basis used by plaintiff was reasonable.[15]

Plaintiff selected as its amortization period the time extending from the beginning of stripping operations and ending with the destruction of USSRMCO'S Copperfield facilities. This time was estimated as 9 years, 1949 through 1957. The estimate proved to be quite accurate, since the destruction of the facilities was completed in October 1957. Plaintiff further estimated the quantity of ore unmined at the beginning of 1949 that would be removed from the entire pit during the 9 years as 253,754,500 tons. This estimate was likewise proved to be quite accurate.

The rationale of the period and quantity elements of the amortization was that the ore to be mined while USSRMCO'S facilities were being destroyed should bear the cost of those facilities. The amortization was thus consistent with plaintiff's position, heretofore noted, that the substitute facilities expenditures represented the price plaintiff had to pay to destroy USSRMCO'S former facilities, wherefore such expenditures were properly allocable solely to the stripping rights in Tract A. No consideration was given to the bundle of rights concept discussed hereinabove.

Defendant contends that the quantity of ore benefited by the expenditures is many times the amount set forth in plaintiff's amortization computation. Insofar as this contention is predicated upon defendant's insistence that open pit mining would have come to a halt throughout the Utah Copper Mine without the 1948 rights, the evidence does not sustain the conclusion.

As previously noted, if plaintiff had been unable to obtain stripping rights on Tract A, open pit mining would have had to be stopped in that southerly sector. Otherwise, the center of the pit could have been moved northward and open pit mining could have been continued, requiring only some readjustments of the benches and slopes surrounding the relocated pit. Thus, the Tract A rights benefited primarily only the ore within the locale of that tract.

14. Citing: Rassenfoss v. Commissioner, 158 F.2d 764 (7th Cir. 1946); Hochschild v. Commissioner, 161 F.2d 817 (2d Cir. 1947); Sergievsky v. McNamara, 135 F. Supp. 233 (S.D.N.Y.1955); and Marsh v. Squires, 38 Am.Fed.Tax Rep. 1581, 1584 (W.D.Wash1947).

15. Plaintiff's reply brief states (p. 14): "A reasonable estimate is all that is required of a taxpayer in estimating such matters for future years for tax purposes. An estimate such as that made by plaintiff should not be upset if reasonably made at the time even if subsequent events prove it to have been erroneous." Citing: Commissioner of Internal Revenue v. Mutual Fertilizer Co., 159 F.2d 470, 471–472 (5th Cir. 1947); Commissioner of Internal Revenue v. Cleveland Adolph Mayer Realty Corp., 160 F.2d 1012, 1014 (6th Cir. 1947); § 29.113(b)(1)–1, Regulations 111.

Bases of amortization other than the one plaintiff used were available.

The basis which defendant contends plaintiff should have used would extend the time over the 40 years representing the full exercise of Tract A stripping rights and would include all of the ore to be mined from the entire pit during all of those years. While such an amortization might have been permissible, the contention that it should be required rests upon a considerable overemphasis of the tonnage benefited.

Another basis of amortization could have rested on the quantity of ore at the southerly edge of the pit, adjacent to or in the immediate vicinity of Tract A, being the ore made available for open pit mining by the 1948 rights. Plaintiff asserts that, by coincidence, the quantity of this adjacent ore was roughly the same as the quantity estimate used by plaintiff, based on ore to be removed from the entire pit.

If amortization had been based upon this adjacent ore, to the extent that such ore would be mined during the period ending with the removal of USSRMCO'S Copperfield facilities, the time element of the amortization would have been the same as the time element used by plaintiff, while the quantity of tonnage benefited would have been much less than the quantity used by plaintiff. If the amortization had been based upon all of the adjacent ore, the quantity of the tonnage benefited might have been roughly the same as the quantity used by plaintiff, but the time element would have been much greater than the time used by plaintiff.

All factors considered, the conclusion is warranted that the quantity of the adjacent ore represents a reasonable base for estimating the tonnage to be benefited by the whole bundle of 1948 rights.

The question remains as to what is a reasonable time factor.

The alternative to the 9-year period used by plaintiff would be the 40-year period estimated as the time required for the full exercise of the Tract A stripping rights. The 40-year span would likewise encompass, for all practical purposes, the useful life of the incidental rights in the 1948 bundle.

Argument that plaintiff's 9-year period was too short, representing less than one-fourth of the whole life span of the 1948 rights, may be immediately countered by the argument that a 40-year period would distort the application of benefits. Adjacent ore immediately available would be favored over ore farther down in the pit.

Thus, the appraisal of the reasonableness of plaintiff's amortization runs full cycle, and returns to plaintiff's initial proposition that an estimate reasonably made at the time should not be upset even if subsequent events prove it to have been erroneous.

## VIII

The Commissioner of Internal Revenue disallowed the claimed deductions on the ground that "the expenditures made by plaintiff to acquire the various *surface rights* from USSRMCO should have been capitalized and returned to plaintiff through annual *depletion* charges, rather than being deducted as ordinary expense." (Emphasis supplied.)

Plaintiff maintains that the expenditures are not recoverable under the depletion allowance provided in section 23 (m) of the Internal Revenue Code of 1939.[16]

Defendant's position is that, while it is unnecessary for the court to decide whether the expenditures should have been added to the depletion account as subsequent capital additions, the costs to plaintiff of obtaining some (if not all) of the 1948 rights are, in defendant's view, capital additions which should have been added to the depletion account.

16. Plaintiff advances the further contention that, inasmuch as it has, since 1946, elected to compute its depletion deductions by the percentage of income method, the practical result of the Commissioner's action is to deny to plaintiff any tax recognition of its substitute facilities expenditures.

Since allowances for depletion of a capital investment and deductions of ordinary expenses are mutually exclusive as applied to a single outlay, in that the mine owner may have one or the other but not both, it is once more pertinent to inquire, in the interest of clarity, whether recovery in this action is precluded by plaintiff's failure to capitalize its substitute facilities expenditures for return to it through annual depletion charges.

As indicated in the ruling by the Commissioner of Internal Revenue, the issue relates to *depletion* charges for the recovery of the cost of *surface rights* obtained by plaintiff from USSRMCO.

Following are pertinent provisions of section 23 of the Internal Revenue Code of 1939:

> Sec. 23. Deductions from Gross Income.[17]
>
> In computing net income there shall be allowed as deductions:
>
> (a) Expenses.—[18]
>
> (1) Trade or Business Expenses.—
>
> (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.
>
> * * * * * *
>
> (*l*) Depreciation.[19] A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business * * *.
>
> (m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *
>
> (n) Basis for Depreciation and Depletion. The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.

Section 114 provided, in pertinent part, as follows:

> 114. Basis for depreciation and depletion—[20]
>
> (a) Basis for depreciation. The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.
>
> (b) Basis for depletion—
>
> (1) General rule. The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.
>
> * * * * * *
>
> (4) Percentage Depletion for Coal * * * and Metal Mines and Sulphur.[21] The allowance for depletion under section 23(m) shall be, in the case of * * * metal mines, * * 15 per centum * * * of the gross income from the property during the taxable year * * *. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property * *.

The "adjusted basis" provided in section 113(b) was the adjustment to cost or to market value as of March 1, 1913.

17. 26 U.S.C. 1952 ed., § 23.

18. As amended by § 121(a) of the Revenue Act of 1942, ch. 619, 56 Stat. 798.

19. As amended by § 121(c) of the Revenue Act of 1942, supra.

20. 26 U.S.C. 1952 ed., § 114.

21. As amended by § 145(a) of the Revenue Act of 1942, supra, and § 124 of the Revenue Act of 1943, ch. 63, 58 Stat. 21.

Depletion provisions have been in the Revenue Acts since 1916. These Acts have uniformly provided that depletion allowances are to be granted under rules and regulations to be prescribed either by the Secretary of the Treasury or by the Commissioner of Internal Revenue with the approval of the Secretary. The Acts themselves have never undertaken to define in detail the scope of depletion allowances.

Pertinent Regulations have included Regulations 33 (Rev.), of 1918;[22] Regulations 45, of 1920; [23] Regulations 77, of 1932;[24] and Regulations 111, of 1942.[25]

Percentage depletion was first authorized by the Revenue Act of 1926. The Revenue Acts of 1932 and 1934 required taxpayers to state in their returns (for 1933 and 1934, respectively) whether they elected to use percentage depletion under section 114(b) (4) or to continue under the general rule provided by section 114(b) (1). Thereafter, the Office of the General Counsel of the Treasury was asked by representatives of the mining industry for its opinion "on the question whether the percentage depletion allowance * * * under section 114(b) (4) * * * should be held to provide, in lieu of any other form of deduction, for the return of 'amounts spent for development (including shaft sinking, tunneling, stripping, etc.) * * which have been capitalized (a) while the mine is in the development stage and (b) after the mine has reached the producing stage.'"

The Opinion, now known and cited as G.C.M. 13954, was written by Assistant General Counsel Robert H. Jackson (later Mr. Justice Jackson).

After noting that the Revenue Acts of 1932 and 1934 required an election by the taxpayer, the Opinion stated the question as follows:

> * * * In order to make the election certain mine owners have requested to be advised whether all the capitalized mine development costs are to be allowed as deductions separately in computing net income, in addition to the percentage depletion allowance, or whether the percentage depletion allowance is in lieu of all or some part of such capitalized costs.

By way of further analysis of the question at issue, the Opinion continued:

> * * * If capitalized mine development costs are not included within the capital to be recovered through depletion, they must be treated as deferred expenses of mine operation deductible separately in the determination of taxable net income. If treated on the latter basis, they will reduce the amount of the net income by which the limitation of the percentage depletion allowance to 50 per cent of the net income from the property is to be determined. It is nevertheless urged on behalf of the taxpayers that such development costs should not be held to be capital costs recoverable through depletion under the Revenue Acts of 1932 and 1934.

After noting the pertinent statutory provisions,[26] and stressing the fact that "neither of these Acts goes into the detail of what subsequent expenditures are properly chargeable to capital account for depletion," and the further fact that "the reasonable allowance for the taxable year is *in all cases* to be made under rules and regulations * * *," the Opinion

22. Promulgated January 2, 1918; relating to income tax imposed by the Revenue Act of 1916.

23. Relating to the income tax under the Revenue Act of 1918.

24. Relating to the income tax under the Revenue Act of 1932.

25. Relating to the income tax under the Internal Revenue Code (applicable only to years beginning after December 31, 1941).

26. Section 23(*l*) of the Revenue Act of 1932 and § 23(m) of the Revenue Act of 1934.

turned to Regulations 77 [27] and quoted excerpts from various Articles therein.[28] In summarizing the effect of them, the Opinion stated:

> * * * the rules and regulations prescribed under the Revenue Act of 1932 indicate no change was contemplated or was made in the capital to be recovered through depletion allowances under the Revenue Act of 1932 from the scope of the allowance under the Revenue Act of 1928 and prior Revenue Acts. Therefore, the rule is that capitalized costs of development during the development stage of a mine are recoverable through depletion, and it would appear to be equally definite that so-called capitalized costs of development after the mine has reached the producing status are not chargeable to the capital account recoverable through depletion, but are deductible from gross income for the proper taxable years as operating costs. * * *

The Opinion then noted a contention that "* * * all development costs, whether capitalized in the development stage or expended after the mine reached the producing status, have in a great many cases been carried by taxpayers in their accounts separately from the capital account recoverable through depletion, and for all practical purposes have been allowed by the Bureau as deductions on the deferred expense basis." The effect of the practice, the Opinion observed, would be to treat all capitalized development costs, whether incurred in the development stage or thereafter, as deferred expense; but, it further observed that no precise differentiation was required by the Regulations prior to 1932, because:

> * * * Capitalized costs during the development stage were considered as benefiting the entire ore body blocked out by the preparatory entries. Such costs after the producing status was reached were deemed to benefit smaller bodies of the same ore and all such costs were to be accounted for as and when the ore was produced and sold. The deductions for tax purposes were in the aggregate in the same amount whether or not any part of those costs was recovered through the depletion account as distinguished from the prepaid or the deferred expense account. Therefore, in the absence of any percentage depletion provisions for mines, no precise determination of what portion of such total development costs should be classified as depletion or as deferred operating expenses was necessary for practical purposes. * * *

Further differentiation between the two types of development costs was found to be required in the application of Article 605 of Regulations 77, which contained the following provision:

> Art. 605. Adjusted basis for determining gain or loss. The adjusted basis for determining the gain or loss from the sale or other disposition of property, is the cost of such property * * * adjusted to the extent provided in this article.
>
> The cost or other basis shall be properly adjusted for any expenditure, receipt, loss, or other item, properly chargeable to capital account, including the cost of improvements and betterments made to the property. In the case of mines and oil or gas wells the following shall not be considered as items properly chargeable to capital account: (1) Expenditures made in the taxable year 1932 or subsequent taxable years which are allowable under article 235 or article 236 as deductions in computing net income; (2) expenditures made in taxable years prior to 1932 which were allowed, or which may hereafter be allowed, as deductions in computing the net income of

27. As governing under the Revenue Act of 1932.

28. Articles 221, 227, 231, 235, 236, and 605.

the taxpayer for such taxable years. * * *

Following is the pertinent language of Article 235:

Art. 235. Allowable capital additions in case of mines. (a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

The Opinion gave the following interpretation of Article 605:

* * * The law prescribes that the reasonable allowance for depletion *in all cases* shall be made under rules and regulations prescribed by the Commissioner, with the approval of the Secretary. The legal basis for the allowance for income tax purposes of capitalized development costs during the development stage of a mine is through the capital account recoverable through depletion. This being the law, the language of article 605 of Regulations 77 * * must be interpreted accordingly, and the term "allowed" as used in connection with deductions in computing net income for taxable years prior to 1932 must be deemed not to apply to development stage capitalized development costs, but should be limited to development costs after the beginning of the producing stage. * * *

The Opinion stated the following conclusion as "responsive to the legal question submitted * * *":

* * * it is the opinion of this office that the capital to be recovered through depletion allowance under the general rule set forth in section 114(b)1 of the Revenue Acts of 1932 and 1934, which the depletion allowances under such Acts are to be taken in lieu of, is composed in part of the capitalized development expenditures during the development stage of the mine; *and that so-called capitalized development costs after the mine has reached the producing status should not be treated as capital charges recoverable through depletion, but as operating expenses deductible in the year in which the ore benefited by such expenditures is produced and sold.* [Emphasis supplied.]

In the instant case, plaintiff claimed deductions under the provisions of the Internal Revenue Code of 1939, as amended, pertinent provisions of which have been quoted hereinabove. The governing rules and regulations were in Regulations 111, of 1940. Pertinent excerpts follow:

Sec. 29.23(m)–11. Depletion and depreciation accounts on books.—Every taxpayer claiming and making a deduction for depletion and depreciation of mineral property shall keep accurate accounts in which shall be recorded the cost or other basis * * * of the mineral deposit and of the plant and equipment, together with subsequent allowable capital additions to each account. * * *

* * * These accounts shall thereafter be credited annually with the amounts of the depletion and depreciation computed in accordance with section 29.23(m)–2, 29.23(m)–3, 29.23(m)–4, or 29.23(m)–5; or the amounts of the depletion and depreciation so computed shall be credited to depletion and depreciation reserve accounts, to the end that when the sum of the credits for depletion and depreciation equals the cost or other basis of the property, plus subsequent allowable capital additions, no further deductions for depletion and depreciation with re-

spect to the property shall be allowed, except such depletion deductions as may thereafter be allowable under section 114(b) (2), or (3), or (4) and section 29.23(m)-3, 29.23(m)-4, or 29.23(m)-5.

Sec. 29.23(m)-15. Allowable capital additions in case of mines. (a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

Plaintiff's brief asserts:

Since the issuance of Regulations 33 (Rev.) on January 2, 1918, the regulations dealing with expenditures which may be added to the depletion account for recovery through depletion deductions have never specified expenditures of the type made by plaintiff under the 1948 agreements with USSRMCO. Regulations 111 does not differ from its predecessors in this respect.

Comparison of Regulations 111 with its predecessors bears out plaintiff's assertion in the concluding sentence above.

Plaintiff's brief continues:

The necessary implication of the absence from a regulation entitled "Allowable Capital Additions In Case of Mines" of any reference to such additions subsequent to the development stage of a mine is that *no such additions to depletion account are permissible after the producing stage has been reached.* [Emphasis added.]

The foregoing assertion is qualified by the following footnote:

This implication is in no way weakened by the possibility of an expenditure, after the producing stage has been reached, made for the purpose of acquiring additional minable ore. Such an expenditure would, of course, be depletable as an acquisition of a new mineral deposit.

This is the essence of plaintiff's case in support of its contention that the Commissioner of Internal Revenue erred in holding that the expenditures made by plaintiff to acquire the various *surface rights* from USSRMCO should have been capitalized and returned to plaintiff through annual *depletion* charges.

Inherent in the argument are (1) the distinction between depletion and depreciation and (2) the inference that plaintiff's expenditures for surface rights constituted development costs of a mine in the producing stage.

Defendant does not challenge the classification of the Utah Copper Mine as having been in the producing stage at times material to this controversy. It does challenge plaintiff's implication that no additions to the depletion account (other than costs of additional minable ore) are permissible after the producing stage has been reached, although it does not suggest specifically the nature of additions that might be made; and it does challenge the inference, inherent in plaintiff's contention, that the expenditures made for surface rights represented development costs. The essence of defendant's contention is that G.C.M. 13954 has no application to this case.

The writer's view is that no decision need be made as to whether or not an implication as sweeping as the one for which plaintiff contends is warranted. When the Commissioner of Internal Revenue ruled that plaintiff's expenditures should have been capitalized in the depletion account, he had reference, in specific terms, to the cost to plaintiff of acquiring the various surface rights from USSRMCO. The only question here is

whether or not those costs were depletable; and their exclusion from the depletion account, in conformity with plaintiff's contention, depends upon whether or not they were development costs.

G.C.M. 13954 points out that:

> * * * The term "development" is a term which is widely used to apply to substantially all mining operations, whether in the making of preparatory openings or later additional openings of any character for extracting the mineral. * * *

This observation was made in the course of distinguishing the "development" stage from the "producing" stage, and was followed by the further observation that the distinction "would appear to apply to all systems of mining, whether by underground methods or by open pit or open cut methods."

With respect to the specifics of development costs, as distinct from development stages, the Opinion refers only to shaft sinking, tunneling, and stripping operations. This is the point at which defendant levels its challenge of the applicability of the Opinion to the instant case. Plaintiff's expenditures were made to acquire surface rights in land. The costs of stripping, dumping, and tunneling operations came later, and are not in issue in this litigation.

Insofar as defendant's position rests on the contention that plaintiff's "surface rights" included minable ore, the facts, as hereinabove recited, do not sustain it. The "possible" ore in Tract A was a contingency only, and the ore recoverable from waste through leaching was an incidental. The facts of the case, viewed in proper perspective, do not warrant the conclusion that plaintiff acquired depletable assets from USSRMCO in terms of mineral deposits.

The distinction of course remains as between the cost of acquiring the surface rights and the costs of exploiting them. In this context, the one word which best describes the surface rights, to distinguish them from their exploitation, is access. The question therefore is whether or not the cost of access to such developmental activities as stripping, dumping, building roadways, tunneling, laying pipe for leaching, is part of the development costs as a whole.

Defendant cites "* * * two cases in which stripping rights were involved * * *," and avers that "in both cases, it was held that the cost of acquiring surface stripping rights was to be capitalized and recovered through *depletion.*" The two cases are: Manchester Coal Co. v. Commissioner, 24 B.T.A. 577 (1931), and Denise Coal Co. v. Commissioner, 29 T.C. 528 (1957), "affirmed on this point" 271 F.2d 930 (3d Cir. 1959).

In Manchester (which was controlling of Denise, the facts being the same), the taxpayer, holding mineral rights in coal lands by lease from the owner, purchased for cash the surface rights to covering and adjacent lands needed for access to the coal seams by strip mining. As noted by the Board:

> * * * By these transactions the petitioner became the owner of two separate and distinct property rights, namely, (1) the right to extract and market the coal, acquired by lease, and (2) the surface of the land acquired by purchase.

Taxpayer destroyed the surface lands in the course of stripping and claimed deductions of the cost of the lands by way of depletion. The Commissioner disallowed the deductions on the ground that the surface had been damaged but not destroyed. Finding the destruction of value to be complete, the Board allowed the deduction, saying "the cost of the land should be added to the cost of the coal in determining the depletion allowable."

Plaintiff contends that "the Manchester and Denise cases are wholly inapposite on their facts to this action," because (1) "the expenditures in [those cases] for surface rights required to institute mining operations were * * * 'starting up' costs * * * incurred prior to the * * * producing stage * * *," and (2) "the result [in each instance]

of the taxpayer's acquisition of the surface lands was, in effect, to merge the separate interests [surface and underground mineral] and give the taxpayer fee simple title to the properties involved," wherefore the rule that the cost of land is never deductible applies.

In relation to the instant case, the persuasiveness of Manchester and Denise is indeed superficial, because of the manifest, although unmentioned, relationship of the expenditures for "access" to the costs of "starting up" the mine. In both cases the depletion of the cost of the surface rights was indissolubly linked to the underlying purpose of depletion deductions—the recapture of the capital investment in minerals. Neither of the cases is controlling of the situation here involved, where the taxpayer acquired additional access to ore in a producing mine.

Plaintiff cites the case of J. Shelton Bolling, 37 T.C. 754 (1962), as a precedent wherein "the Tax Court rejected the suggestion that expenditures for surface rights and other access rights by a contract stripper were recoverable through depletion deductions." This case is even less persuasive than Manchester and Denise. It was concerned with whether or not the taxpayers, who were lessees, had acquired an economic interest in the coal to be mined, or only an economic advantage. The Tax Court, finding that the lease conveyed no economic interest in the coal, held that taxpayers were not entitled to deductions for percentage depletion. The costs to them of surface and other access rights were, therefore, expenses, and were deductible as such. On these facts, it is apparent that the decision does not mean that plaintiff here is entitled, under comparable reasoning, either to a deduction for depletion or a deduction for expense.

The three cases have one point in common. In each instance, a deduction claimed by the taxpayer was disallowed by the Commissioner, under circumstances which would have deprived taxpayer of any tax recognition of the transaction. And, in each instance, the Tax Court allowed a deduction which gave tax recognition to the transaction.

Whether or not the cost of access to areas in which to carry on such developmental activities as stripping, dumping, transport, and leaching is a part of the cost of development in a producing mine remains for consideration without benefit of controlling precedent. If the cost of access is a part of such development cost, plaintiff's expenditures fall squarely within the reasoning of G.C.M. 13954 and are deductible as deferred expenses. If the cost of access is not part of the development cost, the question would still remain as to whether the cost of access should have been added to the depletion account. Unless the cost of access should have been added to the depletion account, plaintiff's failure to seek recapture by depletion deduction would not defeat recovery in this action, if such recovery is warranted on other grounds. This is the narrow question to which the present portion of this opinion is directed.

Defendant's brief asserts that "* * * it is * * * our view that the cost of acquiring the dumping, stripping, tunneling, and pipeline rights (all of which are interests in land) is recoverable only through the *depletion* allowance," and that "Taxpayer has not shown that the rights acquired * * * were depreciable assets of the type covered by the regulation" relating to the receding face doctrine.[29] Separate consideration is given, hereinafter, to the receding face doctrine. Meanwhile, it is pertinent to review briefly the depreciation provisions in the regulations to ascertain the lines of demarcation between depreciation and depletion.

What constitutes depreciable property is defined in Regulations 111, sections 29.23(l)–2 and 29.23(l)–3, as follows (in pertinent part):

> Sec. 29.23(l)–2. Depreciable Property. The necessity for a de-

29. Section 29.23(m)–15(b), Regulations 111.

preciation allowance arises from the fact that certain property used in the business * * * gradually approaches a point where its usefulness is exhausted. The allowance should be confined to property of this nature. In the case of tangible property, it applies to that which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence due to the normal progress of the art, as where machinery or other property must be replaced by a new invention, or due to the inadequacy of the property to the growing needs of the business. It does not apply to * * * stock in trade, or to land apart from the improvements or physical development added to it. * * *

Sec. 29.23(1)-3. Depreciation of Intangible Property. Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which * * * is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value * * * for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance * * *. * * *

█ Depletion, as distinguished from depreciation, is allowable by section 29.23(m)-2 on the value (as adjusted) of the mineral deposit, and is to be computed in terms of mineral units remaining and mineral units sold.

█ The surface rights acquired by plaintiff were easements in, over, and under land. An easement is a right of one in the land of another. It is not the land itself. The owner of the easement has a right, as against the owner of the land, to impose a servitude upon the land. While an easement is not as evanescent as an incorporeal hereditament, neither is it as tangible as corporeal property. As between the "land" mentioned in section 29.23(1)-2 and the "intangible property" mentioned in section 29.23(1)-3, it is closer to a license or franchise.

No suggestion is intended that plaintiff's costs of acquiring the surface rights should be depreciable as intangible property under section 29.23(1)-3. The easements were perpetual in nature. The only fixed limitation upon duration of their value, as applied to the whole bundle of rights, would be the producing life of the mine. This analysis is confined to a grasp of the nature of the rights, as depreciable or depletable. In this context, other requirements being equal, the surface rights would appear more readily identifiable with intangible property, which would be depreciable, than with tangible mineral deposits, which would be depletable.

On the other hand, because of their indefinite life and more especially because of the use to be made of them, any computation of capitalized deduction that might be allowed would more readily be made in terms of mineral units than in terms of limited life or exhaustion. Wear and tear and obsolescence are of course inapplicable.

It is the natural affinity of computation with mineral units which suggests depletion rather than depreciation. While taxation is a practical science, convenience is not the measure of a taxpayer's rights. Logically, the most natural affinity of plaintiff's expenditures in acquiring the rights of access is with the expense of exploiting them, which would make the costs of acquisition development costs along with the costs of exploitation.

During years prior to 1946 (when plaintiff elected percentage depletion), it had consistently added the costs of ac-

quiring rights of access to the costs of exploiting such rights, and had deducted the whole as ordinary or deferred expense, with the approval of the Commissioner of Internal Revenue. Prior experience and approved practice therefore indicated to plaintiff that the cost of acquisition of access rights was a part of development costs. While this precedent is not now controlling of the Commissioner of Internal Revenue, it is indicative of the understanding in the industry. That such an understanding was general throughout the industry is attested by the circumstances recited in and which gave rise to G.C.M. 13954.

It is therefore my conclusion that plaintiff's failure to list its expenditures in its capital account for recovery through depletion allowances should not bar recovery in this action, if the right to recover is indicated on other grounds.

IX

The provision of Regulations 111 applicable to the receding face doctrine appears in section 29.23(m)–15(b) as follows:

> (b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine, or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses.

This provision has appeared without substantial change in all regulations since Regulations 77 under the Revenue Act of 1932. It had its origin in Article 222 of Regulations 45 (Rev.), under the Revenue Act of 1918, which provided in pertinent part:

> * * * After a mine has been developed and equipped to its normal and regular output capacity, however, the cost of additional minor items of equipment and plant, including mules, motors, mine cars, trackage, cables, trolley wire, fans, small tools, etc., necessary to maintain the normal output because of increased length of haul or depth of working consequent on the extraction of mineral, and the cost of replacements of these and similar minor items of wornout and discarded plant and equipment, may be charged to current expense of operations, unless the taxpayer elects to write off such expenditures through charges for depreciation.

As noted in Commissioner of Internal Revenue v. H. E. Harman Coal Corp., 200 F.2d 415, 418 (4th Cir. 1952), the current provision is a confirmation of the decision in Marsh Fork Coal Co. v. Lucas, 42 F.2d 83 (4th Cir. 1930), which held that the cost of electric locomotives, mine cars, and steel rails in an underground mine should be considered as expenditures incident to the removal of the coal. In Harman, the court said "[t]he reasoning underlying this regulation was expressed * * * in Marsh Fork * * * in the following language:

> "'Ordinarily it is true that the purchase of machinery having a life greater than one year is to be charged to capital and not to expense for ordinarily such machinery is purchased either to increase production or to decrease cost and in either event to add to the value of the property. Expenditures such as those here involved, however, are not made either to increase production or to decrease cost of operation. They do not add to the value of the property, and are not made for that purpose. They are made solely for the purpose

of maintaining the capacity of the mine as the working faces of the coal recede. They represent the cost, as it were, of bringing forward the working plant of the operator, which is made necessary as the coal is removed from the mine and the tunnels increase in length.

" 'It is possible, of course, to think of the increased trackage and the increased number of mine cars and locomotives made necessary by the lengthening tunnels as an increase of the capital investment in the mine; but the trouble is that this theory leads to the ridiculous result that, with the increase of investment, the property becomes less valuable, and that, when the investment is complete, the property is practically worthless. *It is much more reasonable, we think, to consider expenditures for trackage, cars, and locomotives to maintain normal output as being an expense necessitated by the removal of the coal which has lengthened the tunnels, and an expense which, in any fair system of accounting, should be charged against the coal so removed.*

" 'When an operator has removed sufficient coal to extend his tunnels so that he cannot maintain production with the equipment which he has, he must as a matter of course lay down more track and put in more cars and locomotives. The question is, Shall the expense thereby incurred be charged against the coal, the removal of which necessitated the expenditure to maintain normal operation, or against the coal yet unmined? *We think it is but fair to charge against the coal which has been mined the expense which its removal has necessitated.* We think, also, that this is the only practicable method of accounting. To capitalize the expenditures made to maintain normal output means that the cost of removal is pyramided against the coal farther back in the mine, with the result that the coal nearest the head house will appear to have been mined at abnormal profit and that farther back at a loss. [Italics supplied.]' "

The limitation in Regulations 45 (Rev.) to "the cost of additional *minor* items" is no longer applicable. In Roundup Coal Mining Co., 20 T.C. 388 (1953), the Tax Court said:

> * * * Respondent now, as he has so persistently in the past, seeks to add another condition which must be met before taxpayer may be permitted to expense the cost of facilities "necessary to maintain the normal output" of a mine. That condition is that the taxpayer must show the expenditure to have been *minor* rather than *major*. We find no authority for his contention. The terms are entirely relative and indeterminable. We must decide this issue upon the basis of Regulations 111, section 29.23(m)–15(a) and (b), because that regulation sets forth the only recognized pattern upon which to base decision.
>
> In the cases last above cited and in Winding Gulf Colliery Co. v. Brast, 13 F.Supp. 743, affd. 94 F.2d 179, it was, in effect, established that if no decrease in the cost of production resulted from an expenditure and no portion thereof was used in the restoration or making good the exhaustion of property, no increase in value of a mine occurred within the meaning of section 24(a) (2). If in addition to the foregoing it is shown that an expenditure is brought about because of the recession of the mine working faces the amount so expended may be expensed.

Plaintiff contends that its expenditures for substitute facilities are deductible as current mining expenses under the receding face doctrine. Such expenditures are said to meet all of the required criteria in that:

(1) They were necessary to maintain the normal output of the Utah Copper

Mine solely because of the recession of the working faces of the mine;

(2) They did not increase the value of the mine;

(3) They did not decrease the cost of production of mineral units;

(4) They did not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made; and

(5) "Although the * * * doctrine is specifically adverted to in the regulations only in connection with the treatment of depreciable items such as equipment, the scope of the doctrine is by no means limited to expenditures for items which would be depreciable if not permitted to be charged to current expense."

Defendant challenges plaintiff's position on the grounds that:

(1) The expense required to obtain Tract A was not merely an expenditure for equipment to *reach the receding face;* it was paid to obtain the *land* upon which work will occur for many years in the future, thus clearly benefiting future production;

(2) The rights which plaintiff acquired from USSRMCO added to the value of the mine;

(3) The rights decreased the cost of production of mineral units; and

(4) Plaintiff has not shown that the rights acquired in 1948 were depreciable assets of the type covered by the regulation.

No question has been raised as to plaintiff's assertion that the expenditures did not represent an amount expended in restoring the property or in making good the exhaustion thereof.

By way of establishing the fact of the recession of the face of the mine, plaintiff relies on a stipulation of the parties that:

> Recovery of ore within plaintiff's mine, and particularly from the lower benches thereof, by the open pit, bench and slope method of mining required extending the upper benches of the open pit toward and into areas that included those occupied by the facilities of USSRMCO at the southeasterly edge of plaintiff's open pit mine.

Defendant, as above noted, does not specifically deny the fact of recession of the face of the mine. Its challenge lies in its assertion that the expense was incurred to obtain the land upon which work will continue for many years, wherefore the benefit extends not only to the receding face but to additional production far in the future.

With respect to benefits to future production, it may be observed that seams of coal ordinarily lie in relatively straight lines which are more horizontal than vertical. The face of the Utah Copper Mine was circular and more vertical than horizontal. Otherwise, there would appear to be no marked difference between the two in terms of the receding face immediately to be benefited and ore to be benefited in the future.

When track is laid in an underground mine to reach the receding face of the ore, the track would, to the extent laid, benefit the mineral beyond the immediate face to be reached. In Roundup Coal Mining Co., supra, capitalization was required of the cost of constructing a rock slope 3,500 feet from the working face for the benefit of future production. Such anticipation of future needs is in a different category from an immediate approach to the receding face, although that approach will be usable in the future. The approach to the face of the Utah Copper Mine through the stripping of Tract A was of the latter category. Defendant's argument, as made, is therefore unconvincing.

In this connection, however, further comment is appropriate to orient the contentions of both parties into the frame of reference heretofore outlined in this opinion. Plaintiff, for its part, once more equates its expenditures with the cost of substitute facilities removed from Tract A, rather than with the whole bundle of rights obtained from USSRMCO.

Defendant, likewise, again adverts to the acquisition of rights in Tract A as the acquisition of land. Viewed in proper perspective, plaintiff incurred the expense of substitute facilities in order to obtain from USSRMCO various surface rights, for stripping, dumping, transport, and leaching.

Was the acquisition of these rights "necessary to maintain the normal output" of the Utah Copper Mine "*solely* because of the recession of the working faces of the mine"? The facts of the case require an answer in the negative.

Defendant cites various cases as going to show that the standards of the regulation, with particular reference to the word "solely," are to be strictly construed. Its primary reliance on this point is upon Commissioner of Internal Revenue v. H. E. Harman Coal, supra. In that case the same court which had decided Marsh Fork, while citing its former opinion with approval, held that the cost of certain mining equipment, consisting of conveyors, loaders, slate-chutes, cutting machines, mine cars, and electric mine jeeps should be capitalized.[30] The court said (200 F.2d pp. 418–419):

> It is clear that neither the language of the regulation nor the reasoning of the Marsh Fork case has application to the expenditures here involved. They have been necessitated not by the removal of the coal during the years in which they were made but by the thinness of one of the seams, the radical change in the nature of another and the shortage of available manpower. They were thus expenditures made in the interest of economy and efficiency and not "solely because of the recession of the working faces of the mine". They unquestionably added to what the value of the mine would have been without them and they decreased "the cost of production of mineral units" within the meaning of the regulation. We think that it is not only required by the regulation but by principles of sound accounting that they be capitalized and their cost spread over the years of their effective life rather than charged off as expense of a single year.
>
> We do not think it determinative that the mine had been developed to full capacity prior to 1944 or that the equipment was purchased in an effort to maintain production. The thin seam of coal, the greater amount of slate and other refuse encountered as a result of the change in the character of the seam being mined and the increasing difficulty of obtaining manpower necessitated additional capital investment as additional mechanization was required for the proper working of the mine; and there is no reason why such investment should be charged against the coal mined during the current year instead of being amortized like other capital investments made in

30. Other cases cited by defendant as indicating the limited application of the regulation include:

W. M. Ritter Lumber Co. v. Commissioner, 30 B.T.A. 231 (1934), requiring capitalization of the expense of making tipple alterations which improved quality of output, although it did not increase normal production.

Franklin Coal Mining Co. v. United States, 15 Am.Fed.Tax R. 860 (N.D.Ala. 1932), requring capitalization of the expense of making a power line replacement which increased output by preventing, further shutdowns caused by repeated failures of the old line.

Preston County Coke Company v. Commissioner, 24 B.T.A. 646 (1931), requiring capitalization of the cost of a coke machine and steam shovel used not in mining but in a manufacturing process.

United States v. Amherst Coal Company, 272 F.2d 930 (4th Cir. 1959), remanded for determination of whether newly installed high-voltage equipment and substations were procured solely because of the recession of the working faces or whether such expenditure increased the value of the mine or decreased the cost of production of mineral units.

the interest of economy and efficiency.

"Marsh Fork and * * * Harman * * * make it clear that an expenditure qualifies as a receding face deduction only when it is necessitated solely by the recession of the working faces of the mine." United States Gypsum Co. v. United States (N.D.Ill., 1962), 206 F. Supp. 744. This case involved many items, some of which were allowed as receding face expenditures while some were required to be capitalized.[31]

Plaintiff's primary purpose in acquiring the rights from USSRMCO was to obtain the stripping rights in Tract A. Dumping rights on Tract B were a concomitant of the stripping rights. If these had been the only rights acquired, the acquisition could well be said to have been made solely to reach the receding face of the mine. Stripping and dumping rights were not, however, the only rights acquired. In addition, there were rights relating to transport (rights-of-way) and to leaching (including rights to run water lines). Rights in these categories were essential to plaintiff to maintain normal output in regular course over a period of years, but the acquisition of them was not necessary solely because of the recession of the working faces of the mine.

Inasmuch as there has been no allocation of costs among the various rights acquired by plaintiff, it is impossible to apply the methods of the Gypsum case by allowing some and disallowing others. Plaintiff's efforts to qualify under the receding face doctrine must therefore fail.

Otherwise, the facts of the case warrant the conclusions that the acquisition of the 1948 rights did not add to the value of the mine or decrease the cost of production of mineral units. Plaintiff's costs of production went up, not down, after the acquisition of the 1948 rights. As for addition to the value of the mine, the decided cases do not take into consideration the fact that a mine with equipment in place to reach a receding face may have a greater value, at least to the extent of the added equipment, than the same mine before the equipment was installed.

Defendant's final point, that plaintiff has not shown that the rights acquired in 1948 were depreciable assets of the type covered by the regulation, would, if it had to be decided, present difficulties similar to those discussed hereinabove in relation to depletion. Whereas development costs ordinarily relate to active operations rather than access, so do costs deductible as expenses under the receding face doctrine usually relate to depreciable assets in the nature of equipment or installations. It is true, as defendant notes in its brief, that plaintiff has not attempted to attribute a useful life in terms of years to any of the rights acquired. Moreover, for other reasons noted in the discussion of depletion, the 1948 rights appear to be nondepreciable. If capitalized in any form for deferred recovery, they would have to be related to mineral units and treated either as deferred expenses or as depletable assets.

In view of the determination hereinabove made that the 1948 rights were not acquired solely because of the recession of the face of the mine, it is unnecessary to examine plaintiff's contention that the scope of the receding

31. As indicated in the headnote: "Capital expenditures v. expenses: Gypsum mine improvements.—Expenditures for the construction of a new ore pocket and the cost of mine equipment such as hoist motors, skips, roundhouse, powder magazine, and air compressors were properly chargeable as current expenses which were necessary to maintain production solely because of the recession of the working faces of the gypsum mines. However, expenditures in the case of other gypsum mines for the construction of an air and escape hatch, power shovel, tractor carry-all, and air compressors were capital expenditures, since these expenditures were not necessitated because of the recession of the working faces of the mines, but were improvements made to increase the value of the properties."

face doctrine is not limited to expenditures for items which would be depreciable if not deductible as expenses.

X

The main thrust of plaintiff's case—the position set forth at the opening of its brief—is based on the contention that the 1948 expenditures were "ordinary and necessary" expenses of mining, within the meaning of section 23(a) (1) (A). In support thereof plaintiff relies upon (1) the purpose of the expenditures; (2) the recurrent nature of the expenditures in the context of its business; and (3) the long-standing practice in the industry respecting such expenditures.

A

Reference has been made heretofore to the practices in the industry. G.C.M. 13954 adverted to an industry representation "that all development costs, whether capitalized in the development stage or expended after the mine reached the producing status, have in a great many cases been carried by taxpayers in their accounts separately from the capital account recoverable through depletion, and for all practical purposes have been allowed by the Bureau on the deferred expense basis." The Opinion further noted that "for audit purposes [prior to 1932, under the regulations then in force], in mining cases there was no practical necessity for any precise distinction between development costs recoverable through depletion account and such costs recoverable through deferred expense deductions, inasmuch as all such costs were prorated over the ore benefited;" and that "capitalized costs * * * after the producing status was reached were deemed to benefit smaller bodies of * * * ore and all such costs were to be accounted for as and when the ore was produced and sold."

The result of the earlier practices, the Opinion continued, was that "deductions for tax purposes were in the aggregate in the same amount whether or not any part of those costs was recovered through the depletion account as distinguished from the prepaid or deferred expense account. Therefore, in the absence of any percentage depletion provisions for mines, no precise determination of what portion of the total development costs should be classified as depletion or as deferred operating expenses was necessary for practical purposes."

Plaintiff relies on the origin and the authority of G.C.M. 13954 in support of its contention that the claimed deductions were sanctioned by long standing and approved practice in the industry. In further support of the "recognized and approved * * * practice * * * of deducting as deferred mining expenses development expenditures incurred after the producing stage of a mine was reached"[32] plaintiff cites the "recognition and approval" of the practice by the Congress, as evidenced (1) by reenactment without change of the applicable Code provisions in the years following the issuance of G.C.M. 13954 and (2) by the liberalization of "the previously existing law" in 1951 "to accord current expense deductibility to substantially all mine development costs."

The Internal Revenue Code of 1939 was amended in 1951 by the enactment of section 23(cc),[33] which provided for a deduction as follows:

(cc) Development of Mines.

(1) In General.—Except as provided in paragraph (2), all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if

32. In this connection plaintiff further asserts that "[t]he long-standing practice of amortizing development costs and deducting them as deferred mining expense is reflected in the provisions of section 29.23(m)–1(g), which defines 'net income' of a mine as gross income less allowable deductions, 'including overhead and operating expenses, *development costs properly charged to expense*, depreciation, taxes, losses sustained, etc. * * *.'" [Emphasis added by plaintiff.]

33. 65 Stat. 486–487.

paid or incurred after December 31, 1950, and after the existence of ores or minerals in commercially marketable quantities has been disclosed. This subsection shall not apply to expenditures for the acquisition or improvement of property of a character which is subject to the allowance for depreciation provided in section 23(*l*), but allowances for depreciation shall be considered, for the purposes of this subsection, as expenditures.

(2) Election of Taxpayer.—At the election of the taxpayer, made in accordance, with regulations prescribed by the Secretary, expenditures described in paragraph (1) paid or incurred during the taxable year shall be treated as deferred expenses and shall be deductible on a ratable basis as the units of produced ores or minerals benefited by such expenditures are sold. * * *

The Senate Report[34] on the bill which contained section 23(cc) summarized the then existing law as follows:

10. *Expenditures in the development of mines.*

Under existing law and regulations all expenditures made with respect to a mine prior to the time it has reached the production stage must be capitalized, except that incidental income from the production of ore while the mine is being developed is offset by development expenditures, only the excess of such expenditures over such receipts being capitalized. Amounts so capitalized are deductible for income-tax purposes only through depletion allowances.

* * * * * *

After a mine reaches the production stage continued expenditures must be made to extend tunnels, galleries, etc., as the working face of the ore or other mineral recedes. Such expenditures are deductible currently, unless extraordinary in scope, in which case they are treated as prepaid expenses to be deducted ratably as the ore benefited by the expenditure is produced and sold.

It is believed that the expenditures for the development of a mine —those incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed—are essentially similar to those incurred after the production stage has been reached, and, like those, should be treated as expenses relating to the production of the ore or minerals.

The bill as submitted by the House Ways and Means Committee provided only that all development expenditures incurred after the discovery of ores or minerals in commercially marketable quantities were to be deductible ratably over the period during which the ores or minerals benefited by such expenditures were sold. The House Report[35] explained the proposal as follows:

Section 302 of this bill changes the treatment of development expenditures in the case of mines and other natural deposits except oil and gas wells. Under existing law and regulations all such expenditures in excess of net receipts from minerals sold are charged to capital account so long as the mine is in the development stage. When the mine has passed into the production stage such expenditures are deductible in the year in which the ore or mineral benefitting from such expenditures is sold. * * *

* * * * * *

Witnesses appearing at the committee's public hearings on this bill emphasized the serious tax consequences which result from the re-

34. Senate Report No. 781, 82d Cong., 1st Sess., p. 43 (1951–1952 Cum.Bull. 458, 489–490), U.S.Code Cong. and Adm.Service 1951, p. 2013.

35. House Report No. 586, 82d Cong., 1st Sess. (1951–1952 Cum.Bull. 351, 379–380), U.S.Cong. and Adm.News 1951, p. 1811.

quirement that development costs must be capitalized [*i. e.*, added to the depletion account] if incurred while the mine is in the development stage. It was emphasized that this rule raises a serious obstacle to expansion in the mining industry. * * *

The House bill was broadened in the Senate to provide for (1) current expense deductibility for all development costs incurred subsequent to the discovery of ores or minerals in commercially marketable quantities, or (2) at the election of the taxpayer, deferred expense deductions with respect to any such costs. The enactment of the section, through the election so provided, enabled mine owners for the first time to amortize and deduct development stage expenditures as deferred expenses.

The significance of G.C.M. 13954 and of section 23(cc) to the discussion in its present context lies in the confirmation of plaintiff's contention that the practice of deducting the development costs of a producing mine by amortizing them as deferred expenses has long been in use by the industry; that it has had the consistent approval of the Bureau of Internal Revenue; and that it has been recently reviewed, considered, and approved by the Congress.

As heretofore noted in the portion of this opinion relating to depletion, defendant does not seriously question the origin and evolution of the law applicable to development costs, as outlined by plaintiff. Defendant's refutation of plaintiff's conclusions rests upon denial of the characterization of plaintiff's expenditures as development costs, for reasons which have likewise been previously noted.

B

Again, as previously indicated in the discussion of depletion, the most persuasive precedent for characterizing plaintiff's expenditures (viewed as the cost of obtaining access) as development costs is to be found in the treatment accorded by the Bureau in prior years to similar expenditures by plaintiff.

The evidence fully establishes the continuity of expenditures by plaintiff for the replacement of facilities that had to be destroyed as a result of the progressive expansion of the pit of the Utah Copper Mine. Some of these facilities were the property of plaintiff; some were the property of others. In either event, the purpose of the replacement was the acquisition of needed space, *i. e.*, access to the ore body.

Over the years, plaintiff has repeatedly destroyed its own facilities and constructed substitutes therefor as necessitated by the expansion of the pit in all directions, including all of the original mine facilities.[36]

Similarly, on a number of occasions prior to 1948 plaintiff replaced facilities which were the property of others as such facilities were found to interfere with the growth of the pit.[37]

Plaintiff is warranted in the assertion that expenditures to destroy and rebuild facilities—both plaintiff's own facilities and those of others—as a direct result of the continuous expansion of the pit have been a commonplace occurrence at the Utah Copper Mine in the years since

36. Among the plaintiff's own facilities so replaced have been: railroad assembly yards; numerous bridges and railroad trestles; railroad switchbacks; personnel living quarters; electrical facilities; water tanks and a tank house; and repair shops.

37. During the period 1910–1947, plaintiff entered into some 200 transactions with as many owners for various stripping, dumping, leaching, and transport rights, for which in some instances it paid cash; in others, cash in lieu of providing substitute facilities; and in still others, substitute facilities were provided. These substitute facilities have included mine tunnels, ventilating shafts, a 7,000-foot vehicular tunnel, railroad spurs, and surface plants (mine buildings, shops, and residences).

1910. Such expenditures have been normal, usual, and customary.[38]

While plaintiff's expenditures under the 1948 agreements were substantially larger than the costs incurred in any of the earlier, similar transactions,[39] they were not of such size as to be extraordinary considering the ever-increasing scale of operations at the Utah Copper Mine.[40] However large the costs may appear in the abstract, they were in fact relatively modest.

Expenditures for substitute facilities in prior years were deducted by plaintiff as ordinary and necessary expenses of mining, with the approval of the Commissioner of Internal Revenue. Plaintiff therefore argues that the similar treatment accorded to its expenditures under the 1948 agreements was in accord with the accounting practices it had previously followed.

Defendant's challenge of this line of argument would, if sustained, be dispositive at the threshold. The "long history of [similar] expenditures" is not disputed in fact; it is challenged in law as irrelevant on the ground that: "Whatever taxpayer's treatment of similar acquisitions in the past may have been, it is without significance in the present case." [41]

The fact that the Commissioner of Internal Revenue is not estopped by previous action in relation to similar expenditures from applying a different treatment to the expenditures in the instant case does not mean that his earlier action or similar outlays is wholly without significance.

Moreover, plaintiff cites the history as "persuasive support." Such history merits consideration on that basis. The question is not estoppel of the Commissioner, but the persuasiveness of prior experience in determining the classification of the USSRMCO expenditures as expenses, current or deferred.

In citing prior outlays plaintiff relies on the role of precedent as a circumstance pointing to deductibility under section 23(a) (1) (A) as noted in Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940):

> * * * One of the extremely relevant circumstances is the nature and scope of the particular business out of which the expense in question accrued. The fact that an obligation to pay has arisen is not suf-

38. These expenditures have been consistently treated by plaintiff as mining expense items, either currently or appropriately deferred, since 1920.

39. The cost to plaintiff in providing substitute facilities for others during the years prior to 1948 was of the order of $3 million. With respect to replacement, through removal, of its own facilities, plaintiff's expenditures were much larger. One tunnel, for example, cost $10 million.

40. The evidence sustains the following assertions in plaintiff's brief (p. 16): "The expenditures here in suit fall into proper perspective when viewed alongside some of the other 'ordinary and necessary' expenses of mining 90,000 tons of ore per day * * * with a current stripping ratio * * * of 1.73 tons of waste removed for each ton of ore, or 156,000 tons of waste per day * * *. *For example, the entire amount expended* for substitute facilities for USSRMCO, $14.5 million, amounted to less than 3% of the total production costs ($487,505,370.60) of the 4,450,788,725 pounds of copper produced * * * in the period 1949 through October 1957—the period over which the * * * expenditures were amortized by plaintiff * * *."

41. Defendant's brief continues: 'The law is clear that the Commissioner is not estopped by such action. Automobile Club of Michigan v. Commissioner, 353 U.S. 180 [77 S.Ct. 707, 1 L.Ed.2d 746]; Exchange Parts Co. of Fort Worth v. United States, [150 Ct.Cl. 538], 279 F.2d 251; Martin's Auto Trimming, Inc. v. Riddell, 283 F.2d 503 (C.A.9th); Polt v. Commissioner, 233 F.2d 893 (C.A.2d); 10 Mertens, Law of Federal Income Taxation (Rev.), Secs. 60.14–60.17. The question in the instant case is simply to determine the proper tax treatment for the expenditures involved. Taxpayer's treatment of supposedly similar acquisitions in prior years, particularly in view of the fact that it did not claim percentage depletion until 1946 * * *, provides the court with no help in resolving that question."

ficient. It is the kind of transaction out of which the obligation arose and *its normalcy in the particular business which are crucial and controlling.* [Emphasis added by plaintiff.]

The foregoing observation was made in connection with ascertaining the meaning of "ordinary," and Mr. Justice Douglas noted that the term as used in section 23(a) (1) (A) "has the connotation of normal, usual, or customary."

What is "normal, usual, or customary" ordinarily has bearing on purpose, and it is the purpose of the expenditures upon which plaintiff rests primary reliance for deductibility under section 23(a) (1) (A). In Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), the Supreme Court ruled that the terms "ordinary and necessary" as used in the statute are not to be given a narrow, restricted, dictionary-type meaning, but are to be applied in each case in the context of the taxpayer's business and the circumstances occasioning the expenditure. The court said (pp. 113–115, 54 S.Ct. pp. 9–11):

> We may assume that the payments * * * were necessary for the development of the petitioner's business, at least in the sense that they were appropriate and helpful. * * He certainly thought they were, and we should be slow to override his judgment. But the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary. Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. * * *
>
> * * * Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.
>
> *   *   *   *   *   *
>
> Many cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with border-line conclusions. * * *

That purpose is an important criterion in distinguishing between capital outlays and ordinary and necessary expenses[42] was noted by the Tax Court in American Bemberg Corp., 10 T.C. 361 (1948), aff'd, 177 F.2d 200 (6th Cir. 1949):

> In deciding whether the expenditures * * * may be classed as expenses of the business, as petitioner contends, or whether they were expended in the acquisition of capital assets, as respondent contends, we think it is appropriate to consider the purpose * * * of the work for which the expenditures were made.
>
> In connection with the purpose of the work, the * * * program was intended to avert a plantwide disaster and avoid forced abandonment of the plant. The purpose was

42. If the taxpayer's purpose in making the outlay was to preserve and maintain an existing business or income producing property, the expenditure has been held to be an "ordinary and necessary" expense even though the outlay was not of a recurrent nature and its benefits extended over a long period of time. Illinois Merchants Trust Co., 4 B.T.A. 103 (1926); Hogg v. Allen, 105 F.Supp. 12 (M.D. Ga.1952); Midland Empire Packing Co., 14 T.C. 635 (1950); Farmers Creamery Co. of Fredericksburg, Va., 14 T.C. 879 (1950).

not to improve, better, extend, or increase the original plant, nor to prolong its original useful life. Its continued operation was endangered; the purpose of the expenditures was to enable petitioner to continue the plant in operation not on any new or better scale, but on the same scale and, so far as possible, as efficiently as it had operated before. The purpose was not to rebuild or replace the plant in whole or in part, but to keep the same plant as it was and where it was. * * *

Plaintiff says that its primary purpose in making the expenditure was to enable it to continue normal production on the same scale under existing plans and methods. So stated, the evidence of record sustains plaintiff's contention. Indeed, this one fact is discernible as a constant thread throughout all details of the controversy. It is the dominant theme.

The result of the outlay was to preserve and maintain an existing business or income producing property.

The motivating purpose of plaintiff in negotiating and consummating the transaction with USSRMCO was to obtain the right to extend the benches of the mine into Tract A.[43] The dumping rights on Tract B were ancillary to this acquisition. In addition to Tracts A and B, the transaction was somewhat broadened by reason of USSRMCO'S request that plaintiff put all of its begs into one ask-it, so to speak, but the incidental rights of dumping, leaching, and transport were all consonant with continuation of normal production under existing plans and methods.

In the opinion of the writer, plaintiff's purpose in entering into the transaction with USSRMCO (i. e., the acquisition of the surface rights in consideration of which the substitute facilities expenditures were made) meets the test as a highly persuasive factor in the ultimate conclusion as to whether those expenditures should be considered a capital outlay or as ordinary and necessary expenses of mining. As such, it points quite definitely toward the latter category.

XI

Plaintiff makes the further contention that the substitute facilities expenditures incurred in the year 1951 are deductible in full in that year under section 23(cc). The origin and text of that provision are set forth hereinabove.

Defendant once more injects a threshold issue, *viz.*, that plaintiff's claim for refund for 1951 did not cite section 23(cc) as a ground for recovery, wherefore, recovery on that ground is barred, inasmuch as "a taxpayer is not permitted under the law to advance one ground for recovery in his claim for refund and thereafter rely upon a different ground in a subsequent suit for refund, the purpose of the requirement being to afford the Commissioner the opportunity in the first instance to correct claimed errors and, if disagreement persists, to limit the litigation to issues which he has reexamined and is prepared to defend."[44]

Plaintiff's responses are (1) that defendant's contention, as made, is in error on the law and (2) that the claim of lack of notice is not supported by the facts.

On the factual issue, plaintiff asserts that its "Claims for Refund for 1949, 1950 and 1951 * * * show that the grounds for recovery stated in the Claim for Refund for 1951 differ slightly from

43. Without the Tract A rights plaintiff could not have continued its "normal production under existing plans and methods." There would have been some interruption of accepted plans and customary procedures.

44. Citing Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542; Carmack v. Scofield, 201 F.2d 360 (5th Cir. 1953); Compagna v. United States, 290 F.2d 682, 685 (2d Cir. 1961); and see also First National Bank of Montgomery v. United States, 150 Ct.Cl. 798, 280 F.2d 818 (1960); and Williamson v. United States, 155 Ct.Cl. 279, 292 F.2d 524 (1961).

the grounds stated for the two earlier years"; and that "[d]ue to the enactment of Section 23(cc) applicable to taxable years ending after 1950, plaintiff inserted the following phrase at the end of the first paragraph of its 1951 Claim for Refund, which was in other respects identical to the first paragraph of its Claims for earlier years: 'either on an amortization basis *or as an immediate deduction when the costs were incurred.*' (Italics added.)"

The added phrase "gave the tax authorities all the information necessary to answer the legal question as to taxability." New Oakmont Corporation v. United States, 86 F.Supp. 897, 901, 114 Ct. Cl. 671, 686 (1949). This being true, further analysis of defendant's proposition that a taxpayer may not advance one ground for recovery in a claim for refund and rely upon a different ground in a subsequent suit for refund is unnecessary.[45]

On the merits of the issue defendant challenges the validity of plaintiff's contention on the ground that the substitute facilities expenditures were not made "for the development of a mine" within the meaning of section 23(cc).

Thus, for the third time in the course of the present analysis, the question arises as to whether the expenditures which plaintiff seeks to deduct as expenses (current or deferred) reflect the costs of development of the mine. Defendant's challenge of the applicability of section 23 (cc) turns on the meaning of development costs in the same manner and to the same extent as its challenge of development costs as used in G.C.M. 13954. Section 23(cc) was an evolutionary step in the treatment of the development costs of a mine in the development stage. The distinction drawn by G.C.M. 13954 was as between the development stage and the producing stage. Development costs, as such, were the same in either stage.

Plaintiff's brief notes that its section 23(cc) contention is an "alternative position," in that "if the substitute facilities expenditures incurred in the year 1951 were not deductible ratably over the ore benefited thereby, as claimed in plaintiff's tax return for that year, they are currently deductible in full for income and excess profit tax purposes in 1951 under the terms of section 23 (cc)."[46]

The "alternative," as stated by plaintiff, requires some analysis to place it in proper focus. If the expenditures made in 1951 are deductible under section 23 (cc), they would be deductible currently and in full, in the year made, since section 23(cc) (1) so provides. Only if the taxpayer made the election provided by section 23(cc) (2) could such expenditures "be treated as deferred expenses * * * deductible on a ratable basis * * *." Under the express terms of section 23(cc) (1), however, the taxpayer is not given the opportunity to make the election unless the expenditures were made "for the development" of the mine.

Aside from its position under section 23(cc), and its relation of the expenditures to the receding face doctrine, plaintiff does not contend that its substitute facilities expenditures were deductible

45. See National Forge & Ordnance Company v. United States, 151 F.Supp. 937, p. 941, 139 Ct.Cl. 222, p. 223 (1957), where the court said: "Attorneys for the Government frequently ask us to apply to claims for refund a requirement of particularity almost as strict as is customarily applied to indictments for crime. The rule of *strictissimi juris* is not applicable to claims for refund. All that is required of them, as a predicate for suit in this court is that they put the Commissioner of Internal Revenue on notice of the ground of the taxpayer's claim that his taxes were erroneously computed. This does not have to be stated with any greater particularity than is necessary to draw the Commissioner's attention to the claim he makes in his subsequent suit."

46. Since section 23(cc) applies to taxable years after 1950, the contention, if valid for the year 1951, would be equally valid for other, subsequent years in which substitute facilities expenditures were incurred.

currently, in the year made. It amortized the expenditures over the tonnage of ore estimated to be benefited, and only the amortized portions of the expenditures allocated to the tonnages mined in the years 1949, 1950, and 1951 were claimed as deductions for those years. This treatment was in accord with the accounting practices which plaintiff had followed for many years.

The amortization of expenses, for deduction ratably, marks a middle ground between costs deductible currently as expenses (as is usually the case with ordinary and necessary expenses deductible under section 23(a) (1) (A)), and costs deductible as capital outlays by way of depreciation or depletion (under sections 23(*l*) and 23(m)). In Regulations 111, section 29.23(m)-1(g), defining net income, refers to "overhead and operating expenses, *development costs properly charged to expense*,[17] depreciation, taxes, losses sustained, etc.," as deductible from gross income. The section then expressly excludes from deduction "any allowance for depletion."

Under section 29.23(m)-15 of Regulations 111, as interpreted by G.C.M. 13954, development costs incurred after the mine has passed into the producing stage are "properly charged to expense" within the meaning of section 29.23 (m)-1(g), but are to be charged ratably, if their nature so indicates. The test of ratability ordinarily is in terms of ore benefited. Section 23(cc) likewise authorizes deduction of expenditures "for the development of a mine."

The crucial distinction at this point is not between deferred expenses, deductible ratably, and ordinary and necessary expenses, usually deductible currently, since section 23(a) (1) (A) as administratively interpreted and applied by the Commissioner of Internal Revenue with the approval of the courts over many years, authorizes expense deductions to be appropriately deferred. The line of demarcation now to be sought is the difference between deferred expenses and depletion. Plaintiff's expenditures may not be deducted as deferred expenses unless they represented development costs.

What, then, are "development" costs and how are they to be distinguished from capital outlays subject to depletion?

As indicated in an earlier approach to this question, plaintiff's expenditures should be considered, in terms of development, as the cost to it of acquiring access (through easements) for use in development operations. Reference to the expenditures merely as the cost of providing USSRMCO with substitute facilities is an oversimplification, which might prove misleading.

The dictionary definition of "development" is of no more assistance in the interpretation of the meaning of the word in tax law than is the dictionary definition of "ordinary." As expressed by Mr. Justice Cardozo, in Welch v. Helvering, supra, "* * * the decisive distinctions are those of degree and not of kind."

From a purely factual standpoint, the writer has no difficulty in relating the cost of access to the cost of development operations. When the owner of a mine —any mine—finds it necessary, in providing a haul road to acquire an easement across the corner of an adjoining owner's land, would there be serious question of the cost of the easement being a part of the cost of the road? If plaintiff's transaction with USSRMCO had been fragmented, so that in one transaction it acquired an easement to run a water pipe across USSRMCO'S land for use in leaching operations; and in another transaction, it acquired dumping rights on a parcel of USSRMCO'S land; and in still another transaction, it acquired the right to strip a segment of USSRMCO'S land: would there not be a natural affinity between the costs of the several easements and the costs of leaching, dumping, and stripping?

The same natural affinity would be present if all four transactions were

17. Emphasis supplied.

merged into one. The relationship is still there, in my view, when the one transaction is amplified into a series of agreements covering a bundle of rights and carrying a consideration of $14.5 million.

The Commissioner of Internal Revenue disallowed the deductions which plaintiff had claimed as expenses on the ground that the expenditures should have been capitalized and returned to plaintiff through annual depletion charges. Manifestly, the Commissioner considered the expenditures to represent a capital outlay rather than an expense.

Defendant's brief asserts that the Commissioner "properly determined that taxpayer was not entitled to a deduction in addition to percentage depletion for the amounts spent in acquiring various property rights * * * from USSR MCO."

Thus, both the Commissioner and defendant (in its brief) imply that addition of the amount of the expenditures to the depletion account would give tax recognition to plaintiff's transaction with USSRMCO. The Commissioner's ruling carries an implied assurance that the expenditures, if capitalized, would be "returned to plaintiff through annual depletion charges." Defendant's brief would deny deduction as expenses as being "in addition to percentage depletion," ostensibly for the same reason. The obvious inference to be drawn is that recovery through depletion charges is more reasonable, under all of the circumstances, than the more liberal allowances of deferred expenses.

Reference to the applicable portions of Regulations 111 shows that:

(1) Plaintiff was obligated to maintain the depletion and depreciation accounts required by section 29.23(m)–11.

(2) Section 29.23(m)–1 authorized "as a deduction in computing net income * * * a reasonable allowance for depletion * * *" which, according to section 29.23(m)–2, was to be computed as follows:

> "* * * If the amount of the basis as adjusted applicable to the mineral deposit has been determined for the taxable year, the depletion for that year shall be computed by dividing that amount by the number of units of mineral remaining as of the taxable year, and by multiplying the depletion unit, so determined, by the number of units sold within the taxable year. * * *"

(3) Section 29.23(m)–5 authorized percentage depletion, which, in the case of metal mines, meant that "a taxpayer may deduct for depletion an amount equal to * * * 15 percent of the gross income from the property during the taxable year * * * not in any case [to] exceed 50 percent of the net income * * * (computed without allowance for depletion) * * *."

(4) Section 29.23(m)–11 required the accounts for depletion and depreciation to—

> * * * be credited annually with the amounts of the depletion and depreciation computed in accordance with section 29.23(m)–2 * * * or 29.23(m)–5; * * * to the end that when the sum of the credits for depletion and depreciation equals the cost or other basis of the property, plus subsequent allowable capital additions, no further deductions for depletion and depreciation with respect to the property shall be allowed, *except* such *depletion* deductions as may thereafter be allowable under section * * * 114(b) (4) and section * * * 29.23(m)–5. [Emphasis supplied.]

Plaintiff elected in 1946 to use percentage depletion, and has since taken depletion deductions on that basis.

It is apparent from the provisions of the regulations that under the "adjusted basis" in use prior to 1946, the $14.5 million expended for the acquisition of surface rights from USSRMCO could have been added to the depletion account and recovered through annual deductions computed under section 29.23(m)–2. It is equally apparent that, while the $14.5 million could have been added to the de-

pletion account after plaintiff elected percentage deductions, such addition would not have resulted in recovery of the amount through annual deductions computed under section 29.23(m)–5, for the reason that the exhaustion of the account through prior credits was no longer applicable, under the exception contained in section 29.23(m)–11.

Consequently, the effect of the ruling by the Commissioner of Internal Revenue, and the result of the contention in defendant's brief is that, inasmuch as plaintiff has the benefit of percentage depletion, it must be content with that deduction, and its outlay for acquisition of surface rights from USSRMCO is entitled to no further tax recognition. This result is quite the opposite of the holding in G.C.M. 13954, which allowed "so-called capitalized development costs" to be deducted as deferred expenses, the percentage depletion allowance to the contrary notwithstanding.

Defendant cites Repplier Coal Co. v. Commissioner[48] as a case wherein the Tax Court, when confronted with G.C.M. 13954, specifically rejected its authority if it were to be read as sanctioning what the Tax Court said amounted to deductions for depletion on both the percentage and the cost basis.

Repplier had constructed a mine tunnel in 1936 at a cost of $86,394.03, thereby making available for production 394,000 tons of coal. Some 5,000 tons were sold in 1936. Repplier contended, and both the Tax Court and the Circuit Court of Appeals accepted as fact, that the mine had passed its development stage some time before and was in a producing status in 1936. The taxpayer sought to deduct as a deferred operating expense a proportionate part of the cost of the tunnel. The Commissioner of Internal Revenue treated the cost as a capital expenditure, recoverable only through depletion. Taxpayer had elected to deduct depletion on the percentage basis in 1935 and 1936.

The Tax Court, in sustaining the Commissioner, said:

> In effect, petitioner's method is to capitalize the expenditure over the period of production and sale of the coal made available by the tunnel, and to secure the return of that investment by annual deductions spread over a like period. At the same time, however, petitioner having elected percentage depletion, will secure a recovery of the same investment by depletion computed upon the income derived from such coal.
>
> Such facts as have been stipulated leave us little doubt that the expenditure is of a capital nature, and certainly there is nothing in the stipulated facts to rebut the Commissioner's determination to that effect. As such the cost is to be recovered through depletion, and this it has elected to take on the percentage of income basis. We have found no provision in the revenue acts or the regulations promulgated thereunder, and petitioner has cited none, that would justify the double deduction sought. *Petitioner relies upon G.C.M. 13954 * * *; but if that ruling is to be read as sanctioning what amounts to deductions for depletion on both the percentage and cost basis, we cannot agree with it.* [Emphasis added by defendant.]

The Tax Court thus (1) rejected the concept developed in G.C.M. 13954 of "so-called capitalized expenses"; (2) equated deductions by way of deferred expenses with depletion based on cost; and (3) held that such depletion based on cost, if allowed in addition to percentage depletion, would result in a double deduction.

Thirteen months after the Tax Court's decision in Repplier, the Supreme Court

48. Decided November 24, 1942, 1 T.C.M. 141 (1942 P–H T.C. Memorandum Decisions, par. 42, 621), *aff'd*, 140 F.2d 554 (3d Cir., 1944).

held, in Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943), that a determination by the Tax Court of the appropriate rule of accounting was a determination of a question of fact; that as such it was solely within the Tax Court's competence; and that it was not subject to review. The Dobson rule was discarded by Public Law No. 773, 80th Congress, 2d Sess., § 36 (1948), 62 Stat. 869, 991. United States Gypsum Co. v. United States, 206 F.Supp. 744 (1962).

Meanwhile, Repplier came before the Circuit Court of Appeals on separate appeals by the taxpayer and the Commissioner.[49] On appeal, the taxpayer amplified its case by adding the contention that the cost of the tunnel was deductible as an ordinary and necessary expense under the receding face doctrine. The court affirmed the decision of the Tax Court, without reaching the receding face contention, on the ground that, under Dobson, "it could not disturb the finding of fact of the Tax Court that the expenditure was a capital expenditure." United States Gypsum Co., supra.

The Gypsum decision contained the following further observations:

> Apparently, the plaintiff [in Repplier] was contending that the expenditure constituted a development expenditure incurred after the production stage was reached; the opinion in G.C.M. 13954 ruled that development expenditures at that stage should be treated as deferred operating expenses (For a discussion of this ruling of the Repplier case, as altered by the Revenue Act of 1951, see Alexander & Grant, "Mine Development and Exploration Expenditures," supra.) * * *
>
> * * * * *
>
> Mine Development Costs Before 1951.
>
> It should be noted that prior to 1951 mine development costs incurred prior to the production stage of the mine were not deductible as ordinary and necessary business expenses. Section 29.23(m)–15 of Treasury Regulations 111 * * *. After the production stage of the mine was reached, development expenditures, made to maintain the output of the mine were deductible as operating costs. Clear Fork Coal Co. v. Commissioner * * * 229 F.2d 638 (6th Cir.1956) reversing * * * 22 T.C. 1075 (1954). Such expenditures were generally treated as deferred costs, deductible in the years in which the ore benefited by the expenditures was produced and sold. See G.C.M. 13954, XIII–2 Cum. Bull. 66, 72 (1934); Alexander & Grant, "Mine Development and Exploration Expenditures," 8 Tax L.Rev. 401, 414 (1952–53); * * *. Since 1951, development costs incurred both before and after the production stage is reached have been deductible as expenses. § 39.-23(cc)–1, Treasury Regulations 118.

In Alsted Coal Co. v. Yoke, 200 F.2d 766 (4th Cir.1952), the mine had been dormant for 17 years, during which time water had accumulated in the mine, supporting timbers had rotted, and debris had accumulated from roof falls. Another company acquired the property to mine pillar coal, pumped out the water, cleared the debris, retimbered, and put in a new tipple. Holding the expenditures were "development costs" chargeable to capital, the court said (p. 767):

> * * * While these expenditures were being made, the old mine was just as truly in a development status within the meaning of the regulation * * * as an ordinary mine would be when expenditures are being made preparatory to initial operation. The operation here was not unlike that involved in Repplier Coal Co. v. Com'r, 1 T.C.M. 141, Id., 3 Cir., 140 F.2d 554, *where the cost of constructing a tunnel in an old mine*

49. Repplier Coal Co. v. Commissioner, and Commissioner v. Repplier Coal Co., 140 F.2d 554 (3d Cir. 1944).

*to reach a new vein of coal was held properly charged to capital and not to expense.* * * * [Emphasis added.]

Plaintiff's reply brief, citing Alsted, would distinguish Repplier as involving a mine in the development stage, although both the Tax Court and the Court of Appeals specifically adverted to its production status.

The court, in Alsted, referred to Guanacevi Mining Co. v. Commissioner, 43 B.T.A. 517, aff'd 127 F.2d 49 (9th Cir.1942) as "directly in point." There, the court said:

> * * * an old abandoned mine was opened up for operation by new methods and it was sought to charge to expense the cost of driving tunnels to new bodies of ore, erecting an ore mill and purchasing necessary equipment. In holding that these expenditures should be capitalized and not expensed, the Board of Tax Appeals said: "The new cost was not to maintain production by continuing existing methods, but to institute a new method and provide for new production. In practical effect it was an investment in a new mining venture with a new period of development. It was not unlike the opening of a newly discovered mine. The expenditure was therefore a capital investment and not an ordinary and necessary expense of operation."

Following are pertinent excerpts from the article in the Tax Law Review,[50] cited in the Gypsum decision:

> * * * After the extension of percentage depletion in 1932 to * * metal mines, representatives of the mining industry regularly contended before Congress and the Bureau of Internal Revenue that mine development costs should be deducted separately and in addition to depletion. In 1951 a receptive Congress enacted provisions allowing deduction of development expenditures and exploration costs. * * * section 23(cc) * * * section 23(ff) * * *.

> * * * Under prior law there was no distinction between exploration and development expenditures, but both were considered to be costs of development. All expenditures with respect to a mine in excess of net receipts from minerals sold were charged to capital account while the mine was in the development stage and were recovered through depletion allowances. After a mine reached the producing stage, ordinary development expenditures required to maintain the output of the mine due to the recession of the working faces were deductible in the year paid or incurred. Expenditures for extraordinary development during the producing stage, however, were considered to be deferred operating expenses deductible ratably as the produced ores or minerals benefited thereby were produced and sold. * * *

> * * * *Although no court has yet found that expenditures in the case before it were made for extraordinary development in the producing stage and were, therefore, to be treated as deferred expenses of production,* two cases have arisen involving expenditures of considerable magnitude for the purpose of reviewing dormant mines for operations of a different type than those formerly conducted. * * * [Citing Alsted Coal Co. v. Yoke, and Guanacevi Mining Co. v. Com'r, both reviewed hereinabove.] [Emphasis supplied.]

> * * * Some confusion is introduced into an otherwise stable pattern by Repplier Coal Company * * *.

> * * * As affirmance of the Repplier decision was based solely upon the application of the Dobson

50. Mine Development and Exploration Expenditures, by Donald C. Alexander and James P. Grant, 8 Tax Law Rev. 401 (1952–1953).

rule, now discarded, it may not be of great significance. By straining somewhat at the facts, one may fit the case under the rule of the Alsted and Guanacevi decisions, although it is hardly as close a fit as admirers of legal symmetry might desire. * * *

* * * The new provision [section 23(cc)] gives taxpayers the right to take current or deferred deductions for extraordinary development expenditures in the producing stage. To the extent that the Repplier case is in conflict with G.C.M. 13954, it is directly overruled. * *

In Clear Fork Coal Co. v. Commissioner, 22 T.C. 1075 (1954), the Tax Court held that "the driving of the entry ways in 1947 and 1948 was for the development of additional ore for mining and, by reason thereof, [the mine] during those years was in the development stage within the meaning of section 29.23(m)-15 of Regulation 111 * * *," wherefore the expenditures in those years which were in excess of net receipts from the coal sold should be charged to capital account and be recoverable through depletion. In its opinion the Tax Court cited Alsted, supra, and Guanacevi, supra, for the proposition that "* * * a mine, though previously and for an extended period in a production status, may again be in the development stage within the meaning of the regulation, even though the new development was not that of other or newly discovered bodies of ore but of ore bodies which previously had been worked."

The Court of Appeals reversed,[51] on the ground that "the reliance of the tax court for its conclusion upon the two cases cited, is not well placed." [52] Holding that Clear Fork was in a production status rather than in the development stage, the court quoted with approval the following excerpt from the opinion in Guanacevi: [53]

> * * * "The teaching of the opinions in Marsh Fork Coal Co. v. Lucas, 4 Cir., 42 F.2d 83, 85, 86, and Enterprise Coal Co. v. Phillips, D.C.Pa., 12 F.Supp. 49, 50, 51, affirmed, 3 Cir., 84 F.2d 565, impresses upon us that if an expenditure is made to *attain* an intended output, it is properly chargeable to capital as a cost of development; if the expenditure is made to *maintain* an output, it is properly chargeable to operating expense." * * [Emphasis by the court.]

It is thus abundantly clear from the decided cases that the reasoning of G.C.M. 13954 has stood the test of time while that of Repplier has not.[54]

It is equally clear from the facts in the instant case that the expenditures made by plaintiff to acquire surface rights in land from USSRMCO were made, not to *attain,* but to *maintain,* production. As heretofore noted, the evidence fully sustains plaintiff's assertion that its primary purpose in making the expenditures was to enable it to continue normal production on the same scale as before, using existing plans and methods. The conclusion follows that the expenditures represented the costs of development of a producing mine.[55]

51. Clear Fork Coal Co. v. Commissioner, 229 F.2d 638 (6th Cir. 1956).

52. P. 642, of 229 F.2d.

53. Id.

54. Unless of course, one accepts the characterization of Repplier by the court in Alsted as a case wherein "the cost of constructing a tunnel in an old mine to reach a new vein * * *," in which event Repplier conforms to the reasoning of Alsted and Guanacevi.

55. The authors of "Mine Development and Exploration Expenditures," supra, asserted in 1952 (8 Tax Law Review 401, 416) that "* * * no court has yet found that expenditures in the case before it were made for extraordinary development in the producing stage," wherefore such expenditures were "to be treated as deferred expenses of production." No such case has been cited in this proceeding by plaintiff; nor has defendant cited any case other than Repplier directly bearing

XIII

Deferred expenses are deductible as ordinary and necessary expenses under section 23(a) (1) (A). In this instance, plaintiff's expenditures represented the "so-called capitalized development costs after the mine has reached the producing status" to which reference was made in G.C.M. 13954, or the costs of "extraordinary development in the producing stage" as characterized by Alexander and Grant in 8 Tax Law Review 401.

While it may be true, as defendant urges, that "section 23(a) (1) (A) is intended primarily to cover expenditures of a recurring nature where the benefit derived from the payment is realized and exhausted within the taxable year," the fact that the benefit is not realized or exhausted within the taxable year does not, *ipso facto*, deprive the payment of classification as ordinary. Instead, the extension of the benefit over a period of time is a flag of caution, signaling one to examine further to see if the payment was for a capital expenditure.[56] The statute does not authorize a deduction of capital expenditures.[57]

Defendant would have the court look "to the extent and permanency of the benefit derived from [plaintiff's] outlay," note that "the benefit of the expenditure is [to be] enjoyed over a comparatively lengthy period of business operation," and conclude that the "expenditure should be treated as one in the nature of a capital outlay * * * [since] it brings about the acquisition of an asset having a period of useful life in excess of one year * * *."[58]

on the issue. The instant case may be the first wherein expenditures involved in litigation are found to have been "made for extraordinary development in the producing stage" within the meaning of the phrase as used by these writers.

56. In Louisiana Land & Exploration Co. v. Commissioner, 7 T.C. 507, 515 (aff'd without discussion on this point, 161 F.2d 842 (5th Cir. 1947)) the Tax Court said: "The distinction between capital expenditures and business expenses is generally *made by looking to the extent and permanency* of the benefit derived from the outlay. The benefit from business expense is generally realized and exhausted within a year and the expense is therefore said to be of a recurring nature. * * * On the other hand, an item of expense is of a capital nature where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period of business operation. * * * A capital expenditure is thus non-recurring, even though many similar expenditures are made by the taxpayer."

57. See United States v. Akin, 248 F.2d 742 (10th Cir. 1957), where the court said: "But the statute is limited to ordinary and necessary expenses paid or incurred in the conduct of a trade or business and *does not authorize a deduction* for capital expenditures. * * * It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a *like advantage to the* taxpayer which has a life of more than one year."

58. Following is a portion of the argument in defendant's brief in support of these contentions: "* * * the rights taxpayer obtained in 1948 from USSRMCO and its subsidiary are many and varied, nearly all of which are *perpetual*, including rights to strip, dump and leach, options to acquire similar rights in the future, a boundary-line agreement, tunnel and pipe-line rights, etc. The evidence has further made clear that, in the ordinary course of events, many years will elapse before any of the rights will be exhausted. The expenditures incurred in the acquisition of these rights were purely and simply expenditures for the acquisition of capital assets, some of which were land or interests in land perpetual in nature, the benefit of which will be enjoyed over a lengthy period of business operation. Indeed, taxpayer has not attempted to place a useful life on the rights acquired. The only testimony in the record is in regard to Tract A, solicited on cross-examination, to the effect that *if mine production continues at its present rate,* the material contained therein will last another forty or fifty years from date of

Plaintiff rests its case, on this issue, on the proposition that "ordinary and necessary * * * are to be applied in each case in the context of the taxpayer's business and the circumstances occasioning the expenditure * * *," as indicated by the Supreme Court in Welch v. Helvering, supra.[59] The facts sustain plaintiff's position that its expenditures under the 1948 agreements with USSRMCO were "ordinary and necessary" mining expenses within the rule of Welch v. Helvering, and were "so-called capitalized development costs" within the meaning of G.C.M. 13954 or "were made for extraordinary development in the producing stage" within the meaning of the phrase used by Alexander and Grant.

Similar expenditures for access (by way of substitute facilities) in prior years were deducted by plaintiff as ordinary and necessary expenses of mining (in some instances deferred) with the approval of the Commissioner of Internal Revenue. The treatment accorded the expenditures under the 1948 agreements was in accord with accounting practices previously followed by plaintiff. Such treatment was also in accord with the recognized and accepted practice in the mining industry of amortizing the costs of development projects required to maintain the current rate of out put of a producing mine. This practice has been confirmed by administrative interpretation over a period of many years.

Inasmuch as the Treasury has consistently followed G.C.M. 13954; since the Utah Copper Mine, in 1948, had been in the producing stage for more than 40 years; and since the Congress, in 1951 (when it adopted section 23(cc)), wrote into legislative history an express reaffirmation of the law as interpreted by G.C.M. 13954: plaintiff rightly insists that the Commissioner of Internal Revenue was bound by administrative practice[60] to recognize the deductions as made by plaintiff, and that his failure to do so violated an established principle expressed by the Supreme Court as follows:[61]

> * * * against the Treasury's prior longstanding and consistent administrative interpretation its more recent *ad hoc* contention as to how the statute should be construed cannot stand. Moreover, that original interpretation has had both express and implied congressional acquiescence * * * [through an amendment to the statute] and through Congress having let the administrative interpretation remain undisturbed for so many years * * *.

## XIV

Although plaintiff is entitled to recover under section 23(a) (1) (A), as

trial. Even after that, the material removed, valuable in and of itself, will still belong to taxpayer. But what about the leaching rights, the dumping rights, the boundary-line agreement, etc.? These rights are perpetual. The evidence does not provide us with any indication as to when, if at all, the usefulness of those rights will terminate.

"The conclusion, we submit, is inescapable, *viz.*, that the expenditures involved were capital expenditures. * * *"

59. 290 U.S. 111, 113–115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

60. "* * * administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. [citing cases] The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

61. United States v. Leslie Salt Co., 350 U.S. 388, 396–397, 76 S.Ct. 416, 100 L.Ed. 441 (1956).

for deferred expenses for the years 1949, 1950, and 1951, some further comment on its rights under section 23(cc) is warranted in the interest of clarity.

Plaintiff amortized its expenditures over the period of time required to provide the substitute facilities for USSRM CO, taking as the ore benefited the quantity of ore mined from the pit as a whole during that time. In an earlier portion of this opinion, analysis was made of the method of amortization used by plaintiff and of the alternative methods that might have been used; and the conclusion was reached that the results achieved by plaintiff's method were reasonable and legally acceptable.

Defendant strongly urges, throughout its brief, that the useful life of the rights acquired by plaintiff is coterminous with the useful life of the mine, wherefore the ore to be benefited encompasses all of the ore yet to be mined plus the ore to be recovered by leaching the waste dumps after active mining ceases.

If it be deemed, *arguendo*, that plaintiff's method of amortization was not reasonable, or that otherwise it is legally unacceptable, the question would arise as to whether a revision of the amortization might now be made to achieve a legally acceptable basis of deferral, or whether plaintiff is bound in this respect by the position formerly taken.

At this point, the provisions of section 23(cc) would become pertinent. Failure by plaintiff to use a legally acceptable method of amortization would not affect the nature of the expenditures as development costs within the meaning of section 23(cc). Plaintiff would therefore have the right to abandon its claims for deduction of amortized expenses for the years 1949 and 1950, and to deduct currently, in the years made, the expenditures made in 1951 and subsequent years.[62]

62. Of the $14,474,701.13 spent by plaintiff for substitute facilities for USSRMCO, the expenditures made in 1949 and 1950 totaled $5,337,887.11, while the balance of $9,136,814.02 was spent during the years 1951–1955.